RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0384p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KENNETH BIROS,

    *Petitioner-Appellee/
Cross-Appellant,*

    *v.*

MARGARET BAGLEY, Warden,

    *Respondent-Appellant/
Cross-Appellee.*

Nos. 03-3067/3107

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-01384—Dan A. Polster, District Judge.

Argued: February 1, 2005

Decided and Filed: September 9, 2005

Before: SILER, GIBBONS, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellant. John Patrick Parker, Cleveland, Ohio, for Appellee. **ON BRIEF:** Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellant. John Patrick Parker, Cleveland, Ohio, Timothy F. Sweeney, LAW OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

    JULIA SMITH GIBBONS, Circuit Judge. An Ohio state jury convicted Kenneth Biros of aggravated murder with two death penalty specifications, felonious sexual penetration, aggravated robbery, and attempted rape. The trial court followed the jury's recommendation and sentenced Biros to death. His convictions and sentence were affirmed on direct appeal, *State v. Biros*, 678 N.E.2d 891 (Ohio 1997), and he unsuccessfully sought post-conviction relief in state court, *State v. Biros*, No. 98-T-0051, 1999 WL 391090 (Ohio Ct. App. May 28, 1999). Biros later filed an application to reopen his appeal, which the Ohio Supreme Court denied on the merits. *State v. Biros*, 754 N.E.2d 805 (Ohio 2001).

1

In September 2001, Biros filed a petition for writ of habeas corpus in federal district court, alleging twenty-five claims of error. The district court granted the writ as to his sentence of death and denied the writ as to his remaining claims. Margaret Bagley, a warden for the State of Ohio, appeals the district court's judgment and order granting a partial writ of habeas corpus under 28 U.S.C. § 2254 vacating Biros's death sentence. Biros cross-appeals from the district court's denial of his petition as to the claims challenging his underlying convictions. For the reasons set forth below, we reverse in part and affirm in part.

## I.

In 1991, an Ohio state jury convicted Biros of the aggravated murder (with two death penalty specifications), felonious sexual penetration, aggravated robbery, and attempted rape of Tami Engstrom. Engstrom left work early due to illness on the night of February 7, 1991, and drove from Hubbard, Ohio, to the Nickelodeon Lounge in Masury, Ohio, to visit her uncle, Daniel Hivner. Engstrom consumed several alcoholic drinks at the Nickelodeon. Petitioner, Kenneth Biros, arrived at the Nickelodeon around 11:00 p.m., approximately one hour after Engstrom's arrival. Biros knew Hivner but had never met Engstrom. By midnight Engstrom had passed out at the Nickelodeon. At approximately 1:00 a.m., Hivner and Biros assisted Engstrom in moving from the bar to the parking lot. Once outside, Engstrom insisted on driving herself home, but Hivner determined that she was too intoxicated to drive and took her keys away from her. According to Hivner, it was at this point that Biros offered to take Engstrom for coffee in order to counteract the effects of the alcohol. Biros and Engstrom left the Nickelodeon parking lot at approximately 1:15 a.m. in Biros's car. Hivner waited at the bar past closing time for Biros to return with Engstrom, but Biros never returned.

The following day Andy Engstrom, Tami Engstrom's husband, drove to Biros's home after learning that Engstrom was last seen with Biros. Biros claimed that he tapped Engstrom on the shoulder while they were in the car and she "freaked out, got out of the car and started running through these people's yards on Davis Street" in Sharon, Pennsylvania. Biros told similar stories to several other people on February 8.[1] Several of the individuals Biros spoke to observed cuts and scratches on Biros's hands and a fresh wound over his right eye. Biros explained that he injured his hands when he locked himself out of his house and had to break a window and cut his eye while chopping wood. Biros assisted Engstrom's relatives in searching for her in the area where he claimed to have last seen her.

Biros lived in Brookfield Township, Ohio, with his mother and brother. On the morning of February 8, Biros's mother found a gold ring on the bathroom floor of their home. Biros first told his mother that he knew nothing about the ring when she questioned him, but later said that it might belong to the woman who jumped out of his car early that morning. Biros then took the ring and told his mother he would return it to the Nickelodeon. Rather than returning the ring to the bar, Biros hid it in the ceiling of his house.

On February 9, police officers called Biros's home and left a message requesting that he come to the police station for questioning. Upon hearing the message, Biros drove to the police station to discuss Engstrom's disappearance with Brookfield Township, Ohio, and Sharon, Pennsylvania, police officers. The officers informed Biros that he was not under arrest and was free to leave at any time. Biros repeated the same story that he had previously told Engstrom's family and friends. Specifically, Biros told police that he left the Nickelodeon with Engstrom early in the morning on February 8 to get coffee and food in Sharon, Pennsylvania. Biros claimed that Engstrom

---

[1] Specifically, Biros told Engstrom's mother, her brother, her uncles, and her friends, acquaintances, and others, that after he and Engstrom left the Nickelodeon, she woke up, became frightened, jumped from the vehicle, and ran between houses on Davis Street in Sharon, Pennsylvania. Biros also told several people that he initially chased Engstrom on foot, but abandoned the chase to avoid being caught operating a vehicle while under the influence of alcohol.

passed out in his car, but later woke up while Biros was withdrawing money from an automated teller machine. According to Biros, Engstrom insisted that he drive her back to the Nickelodeon. Biros told police that as he was driving on Davis Street in Sharon, Pennsylvania, Engstrom jumped from the vehicle and ran away. When asked whether Engstrom might have left her purse in his vehicle, Biros responded that he had cleaned the vehicle and found no purse.

During the interview, Captain John Klaric began to question Biros's account of the events leading up to Engstrom's disappearance. Klaric suggested that perhaps Biros had made a sexual advance toward Engstrom, which might have caused her to flee from the vehicle. Biros denied making any sexual advances. Klaric also suggested that perhaps Biros had made a sexual advance and Engstrom jumped from the vehicle and struck her head. Biros also denied this hypothesis. After further questioning, Klaric suggested that maybe an accident had occurred during which Engstrom fell out of the car and struck her head. It was at this point that Biros responded "yes," and admitted that he had done something "very bad." Klaric offered to speak to Biros alone and Biros agreed. According to Klaric, after the other police officers left the room, Biros told him, "It's like you said, we were in the car together. We were out along the railroad tracks. I touched her on the hand. Then I went further. I either touched or felt her leg. She pushed my hand away. The car wasn't quite stopped. She opened the door and fell and struck her head on the tracks." Biros told Klaric that Engstrom was dead and that the incident occurred along the railroad tracks near King Graves Road in Brookfield Township. At that point, police informed Biros of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Biros signed a written waiver of his *Miranda* rights and then repeated his story to Detective Rocky Fonce of the Brookfield Township Police Department. Biros told police that Engstrom's body was in Pennsylvania. When police requested that Biros give them an exact location, Biros asked to speak to an attorney. After consulting with an attorney, Biros agreed to show police the location of Engstrom's body.

Ohio authorities discovered several of Engstrom's severed body parts in a desolate wooded area of Butler County, Pennsylvania on February 10. Police found other portions of Engstrom's body in a desolate wooded area of Venango County, Pennsylvania, approximately thirty miles north of the Butler County site. Engstrom's head and right breast had been severed from her torso. Her right leg had been amputated above the knee. The body was completely naked except for what appeared to be remnants of black leg stockings that had been purposely rolled down to Engstrom's feet or ankles. The torso had been cut open and the abdominal cavity was partially eviscerated. The anus, rectum, and all but a small portion of her sexual organs had been removed and were never recovered by the police.

Forensic technicians and law enforcement investigators searched the area of the railroad tracks where Biros had indicated that the incident with Engstrom occurred. The investigators discovered a large area of bloodstained gravel near the tracks, blood spatters on the side of one of the steel tracks, and numerous other bloodstains in the same general area. Bloodstains and swabbings of blood collected at the scene were tested and found to be consistent with Engstrom's blood. Investigators also found what appeared to be part of Engstrom's intestines in a swampy area near the railroad tracks. DNA testing confirmed that the intestines recovered were part of Engstrom's remains. Approximately one month later, investigators found Engstrom's black leather coat partially buried near the tracks. There were two cuts or slash marks on or near the collar of the coat. Engstrom's house keys and a tube of lipstick were also found in a shallow hole near the coat. One of Engstrom's black leather shoes was also found in the area near the tracks.

A number of items were also recovered by police during a search of Biros's house including a bloodstained pocket knife, another, much larger knife, a bloodstained coat later identified as the coat Biros wore to the Nickelodeon, and a pair of size eleven tennis shoes. The bloodstains from

Biros's pocket knife and coat were tested and found to be consistent with Engstrom's blood. Additionally, a hair found embedded in a seam near the tread of one of the tennis shoes was tested and found to be consistent with known samples of hair from the victim's head.  The police also searched the car Biros drove to the Brookfield Township Police Department.  Forensic technicians identified several bloodstains in the car, some were consistent with Engstrom's blood and others were consistent with Biros's blood.  A small piece of tissue, believed to be from Engstrom's liver, was found in the trunk of the car.

An autopsy of Engstrom's body revealed that she suffered ninety-one premortem injuries indicative of a "severe beating" and "an attempt at sexual mutilation" and five stab wounds which were inflicted immediately after Engstom's death.  In addition to these wounds, Engstrom's head, right breast, and right lower extremity had been severed from her body at some point following her death.  Her anus, rectum, urinary bladder, and virtually all of her sexual organs had been removed and were never found.  Her gallbladder, the right lobe of her liver, and portions of the bowels were also extracted from her body.  The coroner found no evidence that Engstrom had been struck by an automobile as Biros claimed and concluded that Engstrom had died of asphyxia due to strangulation.

The Trumbull County Grand Jury issued a five-count indictment against Biros on February 14, 1991, charging him with aggravated murder with two specifications of aggravating circumstances (count 1), felonious sexual penetration (count 2), abuse of corpse (count 3), aggravated robbery (count 4), and attempted rape (count 5).  Biros pleaded not guilty to all charges and specifications.  The State of Ohio dismissed the abuse of corpse charge prior to trial.  A jury convicted on the remaining four counts and recommended that Biros be sentenced to death on the capital charge.  The trial court filed a written opinion concluding that the aggravating circumstances outweighed the mitigating factors and sentenced Biros to death.

Biros timely appealed his conviction and death sentence to the Ohio Court of Appeals, Eleventh District,  and to the Ohio Supreme Court.  *Biros*, 678 N.E.2d at 901.  His convictions and sentence were affirmed on direct appeal.  Biros next unsuccessfully sought post-conviction relief in state court.  *Biros*, 1990 WL 391090, at *10.  He later filed an application to reopen his appeal from his convictions under Ohio Rule of Appellate Procedure 26(B).  The Supreme Court of Ohio denied the application on the merits.  *Biros*, 754 N.E.2d at 807.

In September 2001, Biros filed his petition for a writ of habeas corpus in federal district court, which granted the writ as to his sentence of death and denied the writ as to his remaining claims.  Bagley filed a timely notice of appeal from the district court's decision to vacate Biros's death sentence.  Biros filed a timely notice of cross-appeal from the district court's decision to deny the remainder of his petition.

## II.

Because Biros filed his petition after April 24, 1996, it is subject to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Campbell v. Coyle*, 260 F.3d 531, 538-39 (6th Cir. 2001).  Accordingly, this court reviews the district court's legal conclusions *de novo* and its factual findings for clear error.  *Moss v. Hofbauer*, 286 F.3d 851, 858 (6th Cir. 2002).  Here, however, the district court made no independent determination of fact, so its factual findings are also reviewed *de novo*.  *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir. 2003).

Under the AEDPA, a writ may not be granted unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court renders an adjudication "contrary to" federal law when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court renders an "unreasonable application" of federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. Claims involving a mixed question of law and fact are reviewed under the "unreasonable application" prong of 28 U.S.C. § 2254(d)(1). *See Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003) (citing *Harpster v. Ohio*, 128 F.3d 322, 327 (6th Cir. 1997)). Factual findings made by the state court, or by state appellate courts based upon the trial record, are presumed to be correct but may be rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Bugh*, 329 F.3d at 500-01.

## III.

Bagley contends that the district court improperly granted the writ as to Biros's claim of an insufficient indictment. As his first ground for habeas relief, Biros asserted that the prosecution's indictment against him was insufficient to sustain a capital charge because the two death penalty specifications did not contain language indicating whether he was the principal offender or whether he committed the offense with prior calculation and design, as mandated in Ohio Rev. Code Ann. § 2929.04(A)(7). Biros also argued that the jury instructions lacked the requisite language to support a capital conviction, meaning that the jury did not find each element of the capital offense beyond a reasonable doubt. Bagley argues that Biros's claim was procedurally defaulted because Biros challenged the indictment for the first time on direct appeal rather than entering an objection at trial. The district court held that this claim was procedurally defaulted, but nevertheless granted habeas relief based on this court's holding in *Esparza v. Mitchell*, 310 F.3d 414, 421 (6th Cir. 2002), which affirmed the issuance of a writ because the indictment against the defendant did not indicate whether he acted as the principal offender or whether he committed the offense with prior calculation and design. *See* Ohio Rev. Code Ann. § 2929.04(A)(7). The district court also noted that the *Esparza* decision held that review of this claim was not subject to harmless error analysis.

Federal habeas review is precluded where a state court does not address a petitioner's federal claims because the petitioner has failed to meet a state procedural requirement that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). To determine whether a petitioner has procedurally defaulted a claim for the purpose of federal habeas review, a federal court must consider: (1) whether there is a procedural rule applicable to the petitioner's claim and whether the petitioner failed to follow this rule; (2) whether the state courts actually enforced the state procedural rule; and (3) whether the state procedural rule is an adequate and independent state ground to foreclose relief. *Monzo v. Edwards*, 281 F.3d 568, 575-76 (6th Cir. 2002). The adequacy of a state procedural bar turns on whether it is firmly established and regularly followed; a state rule is independent if the state court actually relies on it to preclude a merits review. *Abela v. Martin*, 380 F.3d 915, 921 (6th Cir. 2004) (citation omitted). If the previous three questions are answered affirmatively, then the federal court must consider whether the petitioner has established cause for his failure to follow the rule and prejudice resulting from the alleged constitutional error. *Monzo*, 281 F.3d at 576.

Biros's claim is procedurally defaulted. On direct appeal, the Ohio Supreme Court determined that Biros raised no objection concerning the sufficiency of the indictment at trial. *Biros*, 678 N.E.2d at 901. The Ohio Supreme Court held that Biros's "failure to timely object to the allegedly defective indictment constitutes a waiver of the issues involved." *Id*. at 901-902 (citing

*State v. Joseph*, 653 N.E.2d 285, 291 (Ohio 1995)).  Thus the state supreme court reviewed the claim for plain error and rejected it, concluding that "the indictment clearly provided appellant with adequate notice of the death penalty specifications with which he was being charged."  *Id*. at 903. This court has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal habeas review and that the application of plain error review constitutes enforcement of the rule.  *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

Biros contends that the contemporaneous objection rule was neither firmly established nor regularly followed, as the *Joseph* decision, upon which the Ohio Supreme Court relied for its holding that Biros waived his challenge to the indictment, post-dated Biros's trial by four years.  However, *Joseph* cites *State v. Williams*, 364 N.E.2d 1364 (Ohio 1977) in support of its holding.  *Williams*, which held that "an appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court," *see id.* at 1367, pre-dates Biros's trial by nearly fourteen years and incorporates the contemporaneous objection rule as set forth in Ohio Rule of Criminal Procedure 30.  *See Engle v. Isaac*, 456 U.S. 107, 124-25 (1982).  Any other rule would create an incentive for defendants to postpone challenging a faulty indictment until after trial.

Despite the fact that this claim was procedurally defaulted, the district court addressed the merits and granted the writ as to this claim.  The district court reasoned that this court's *Esparza* opinion concluded that the type of error about which Biros complained is a structural defect and not subject to dismissal on procedural grounds.  The district court also observed that this court held that harmless error analysis was not proper for the claim in *Esparza*.  In *Esparza*, this court explained that "[n]one of the seminal Supreme Court Eighth Amendment cases requiring the narrowing of the class of defendants eligible for the death penalty permits the offender to be executed because the error was deemed harmless."  *Esparza*, 310 F.3d at 421.

The Supreme Court reversed this court's holding in *Esparza*, finding that the Sixth Circuit exceeded its authority under § 2254(d)(1) "[i]n relying on the absence of precedent to distinguish our non-capital cases, and to hold that harmless-error review is not available for this type of Eighth Amendment claim."  *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).  The Supreme Court further stated that, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous."  *Id*. at 17.  Ultimately the Court found that

> [t]he Ohio Supreme Court has defined a "'principal offender'" as "'the actual killer,'" *State v. Chinn*, 709 N.E.2d 1166, 1177 (1999), and in this case, the jury was instructed on the elements of aggravated murder, "'defined as purposely causing the death of another while committing Aggravated Robbery,'" 310 F.3d at 432 (Suhrheinrich, J., dissenting). . . . In light of these instructions, the jury verdict would surely have been the same had it been instructed to find as well that the respondent was a "principal" in the offense.  After all,  he was the only defendant charged in the indictment.  There was no evidence presented that anyone other than respondent was involved in the crime or present at the store. . . . Under these circumstances, we cannot say that the state court's conclusion that respondent was convicted of a capital offense was objectively unreasonable.  That being the case, we may not set aside its decision on habeas review.

*Id*. at 18-19 (parallel citations and footnote omitted).  Additionally, the Court held that harmless error review can apply to Eighth Amendment claims based upon "the trial court's failure to instruct a jury on all of the statutory elements of an offense."  *Id*. at 16.  The Court distinguished between an omitted instruction that would cast doubt upon all of a jury's findings, thereby voiding the conviction, and an omitted instruction that precluded the jury from determining only one element of an offense that

would be subject to harmless error analysis, implicitly determining that Esparza's situation fell into the latter category. *Id*. at 16-17. Moreover, the Court concluded that the state court's harmless error review was not objectively unreasonable under AEDPA, as the defendant's capital conviction would have been the same had the indictment and jury instructions contained the "principal offender" language because "[t]here was no evidence presented that anyone other than [the defendant] was involved in the crime." *Id*. at 18.

Biros's claim calls for a similar conclusion. To determine harmfulness the court must ask, "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Coe v. Bell*, 161 F.3d 320, 335 (6th Cir. 1998) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). It is clear that the erroneous indictment and jury instructions at issue in the present case had no such effect or influence on the jury's verdict. The district court opinion states that: "if a harmless error standard of review was applied to this habeas claim, the Court would be constrained to rule differently since there is absolutely no question that Biros, who admitted killing Tami Engstrom, albeit accidentally, acted alone." Based on the foregoing, we reverse the grant of the writ as to Biros's sentence.

## IV.

Biros raises four issues on cross-appeal: whether his statements to the police should have been suppressed, whether the prosecution's use of peremptory challenges to remove prospective jurors who expressed hesitation about the death penalty denied him a fair trial, whether the admission of cumulative and gruesome photographs denied him a fair trial, and whether sufficient evidence supports his conviction for aggravated robbery.

### A.

Biros contends that he was denied his right against self-incrimination and a fundamentally fair trial because the trial court failed to suppress statements he made during a police interview as a prime suspect in police custody and without being given *Miranda* warnings. The Ohio Supreme Court concluded that the factual circumstances did not indicate that Biros was in custody for *Miranda* purposes and rejected the claim on the merits. *Biros*, 678 N.E.2d at 905. The district court held that the state court's determination was not an unreasonable application of Supreme Court precedent.

*Miranda* warnings are required where a suspect is "in custody," which occurs when "there has been a 'formal arrest or restraint on freedom of movement.'" *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). A reviewing court determines whether or not a defendant is in custody by considering "the objective circumstances of the interrogation," rather than "the subjective views harbored by either the interrogating officers or the person being questioned." *Id*. (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)). Instead of focusing upon where the questioning occurred or if the individual is a suspect, the determination must be concerned with "how a reasonable man in the suspect's position would have understood his situation." *Id*. (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). Whether a defendant is "in custody" is a mixed question of law and fact and therefore is subject to *de novo* review. *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (citing *Thompson v. Keohane*, 516 U.S. 99, 102 (1995)).

The district court properly concluded that the Ohio Supreme Court's application of clearly established Supreme Court precedent was not unreasonable. Officer Frank Murphy left a message on Biros's telephone answering machine indicating that investigators would like to interview him concerning Engstrom's disappearance. He asked Biros to visit the police station, which Biros did. On his way to the police station, a police officer passed Biros on the road, stopped Biros, and told him that the police wanted to speak with him. The officer then continued on his patrol, and Biros

proceeded to the police station, arriving alone at 5:35 p.m.  When Biros entered the station, Officer Rocky Fonce accompanied him to an interrogation room, which was approximately six feet by nine feet and contained a desk, a cabinet, a few chairs, a blood alcohol content analyzer, and a video camera.  The interrogation room's door was left open.  The police gave no indication that Biros was under arrest or not free to leave.  Biros's freedom was not limited and his movements were not restrained.  Biros was not told that he was under arrest or that he could not leave.  In fact, at some point during Biros's thirty-five minute conversation with Officer John Klaric, Klaric told Biros that he was free to leave and was not required to answer questions.  After Biros told Klaric and Fonce that Engstrom had died while running from his car after he made sexual advances toward her, Biros was given *Miranda* warnings because the information provided during the interview justified Biros's arrest.

In light of the trial record, the district court properly held that the state court's decision was not an unreasonable application of Supreme Court precedent.  The location of the interview in the police station or that Biros was a suspect does not, without more, suggest that *Miranda* warnings were required.  *See California v. Beheler*, 463 U.S. 1121, 1125 (1983).  Biros traveled voluntarily to the station for the interview.  Additionally, Biros remained unrestrained throughout the interview.  The police did not place him under arrest or otherwise indicate that he was not free to leave.  Indeed, he was affirmatively told that he was free to leave and was not required to answer questions.

**B.**

Biros also contends that the prosecution violated *Witherspoon v. Illinois*, 391 U.S. 510 (1968), by improperly using its peremptory challenges to exclude two jurors, Malcolm May and Gary Rodgers, who had expressed opposition to the death penalty during voir dire.  The Ohio Supreme Court held that peremptory challenges can be used to exclude a juror for any reason, except for race or gender, and rejected this claim.  *Biros*, 678 N.E.2d at 906 (citing *State v. Ballew*, 667 N.E.2d 369, 379 (Ohio 1996)).  The district court determined that the state court's decision was not an unreasonable application of Supreme Court precedent.

The district court's determination was proper.  "[A] juror may not be excluded merely 'because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.'"  *Byrd v. Collins*, 209 F.3d 486, 530 (6th Cir. 2000) (quoting *Witherspoon*, 391 U.S. at 522).  This court has recently explained, however, that *Witherspoon* cannot support a claim challenging the exercise of peremptory challenges because "*Witherspoon* dealt with the practice of excluding *for cause* jurors who expressed conscientious or religious scruples against capital punishment."  *Dennis v. Mitchell*, 354 F.3d 511, 526 (6th Cir. 2003).  Instead, "peremptory challenges may be used for any reason so long as they are not based on immutable characteristics like race and sex."  *Id*. at 525.  Greater restrictions would frustrate the purpose of peremptory challenges, which enable each side to "exclude those jurors it believes will be most partial toward the other side, . . . thereby assuring the selection of a qualified and *unbiased* jury."  *Id*. at 525-26 (quoting *Holland v. Illinois*, 493 U.S. 474, 483-84 (1990)) (internal quotation marks omitted).

Additionally, the trial record belies Biros's claim that the prosecution exercised its peremptory challenges to excuse May and Rodgers concerning their views on the death penalty.  The prosecution informed the trial court that May was excused because he had difficulty accepting the use of circumstantial evidence at trial and understanding how a conviction can be supported without eyewitness evidence.  Biros did not object to the prosecution's exercising a peremptory challenge for Rodgers.  Notably, Rodgers stated at least three times during voir dire that he was not opposed to the death penalty and could impose it if warranted.  The district court properly held that the state court's decision was not an unreasonable application of Supreme Court precedent.

**C.**

Biros argues that he was denied a fundamentally fair trial as the trial court improperly admitted three photographs – depicting Engstrom's severed head, her severed head held near her torso and severed breast, and her torso with the severed head and severed breast replaced on torso – that "did not assist the jury in revealing the victim's cause of death," as the injuries occurred after Engstrom's death. The Supreme Court of Ohio rejected a more general claim challenging a larger group of photographs pursuant to Ohio Rules of Evidence 403 and 611(A), finding that

> the wounds depicted in the slides and photographs were probative of contested issues of intent, purpose, motive, and the cause, manner and circumstances of the victim's death. Although gruesome, the photographic evidence of the victim's body and body parts was highly probative, and the value of the evidence clearly outweighed the danger of unfair prejudice.

*Biros*, 678 N.E.2d at 908. The district court again held that the state court's decision was not an unreasonable application of Supreme Court case precedent.

Generally, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir. 2002) (citing *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994)). Here, the photographs were used to describe what happened to Engstrom after her death. As the Ohio Supreme Court noted, Biros asserted at trial that he accidentally killed Engstrom by placing his hand over her mouth, did not strike her with his fists, and mutilated her body in a "blind rage" with a pocket knife. *Biros*, 678 N.E.2d at 907. The court found, however, that the photographs were properly admitted as they demonstrated that Biros beat Engstrom rather severely and meticulously dissected her body with two different knives. *Id.*

Additionally, the state court acknowledged the trial court's efforts to limit the prejudicial impact of the photographs to Biros. Of the thirty-one slides reviewed in camera, the trial court admitted only nineteen. *Id.* at 908. The trial court also instructed the jury that "these photos are introduced in order to show you what has been described as premortem and postmortem injury. These photos are introduced for this purpose and this purpose only." *Id.* The trial court's precautionary measures ensured that the introduction of the photographs would not deny Biros a fundamentally fair trial. The district court properly held that the state court did not unreasonably apply Supreme Court precedent.

**D.**

Finally, Biros contends that there was not sufficient evidence to support his conviction for aggravated robbery under Ohio Rev. Code Ann. §§ 2903.01 and 2929.04(A)(7), as he testified that he did not intend to steal a ring from Engstrom. The Supreme Court of Ohio rejected this claim on the merits, explaining that an individual killed just prior to being robbed need not be alive to be a victim of robbery and that "[a]ppellant's intent to steal need not have preceded the murder" for statutory purposes. *Biros*, 678 N.E.2d at 912. The district court determined that Biros did not demonstrate that the state court unreasonably applied Supreme Court precedent.

When considering a claim challenging the sufficiency of the evidence supporting a conviction, this court must "determine whether, after reviewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).

To prove aggravated robbery, the prosecution must establish that the defendant committed or attempted to commit a theft offense while in possession of a deadly weapon or dangerous ordnance on or about his person or under his control, or inflict, or attempt to inflict serious physical harm on another. Ohio Rev. Code Ann. §§ 2911.01(A)(1)-(2). The Ohio Supreme Court determined that the prosecution presented sufficient evidence of aggravated robbery, explaining:

> Evidence was presented which, if accepted, clearly shows that appellant beat Tami, attempted to rape her, and strangled her to death. Appellant's testimony was that he began cutting Tami's body after he killed her, took her ring as he was dragging the body away, severed the head and leg, and then buried Tami's body parts. Thus, even by appellant's own testimony, his theft of the ring was *associated with* the killing *as part of one continuous occurrence*. Appellant cannot escape the felony-murder rule by claiming that the aggravated robbery was simply an afterthought. "[T]he victim of robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of aggravated robbery. The victim need not be alive at the time of the asportation." *State v. Smith*, . . . 574 N.E.2d 510, 516 [(Ohio 1991)]. Appellant's intent to steal need not have preceded the murder for purposes of [Ohio Revised Code §§] 2903.01(B) and 2929.04(A)(7). [*State v.*] *Williams*, [(1996)], . . . 660 N.E.2d 724.

*Biros*, 678 N.E.2d at 912. The district court properly determined that the state court did not unreasonably apply Supreme Court precedent to this claim.

## V.

For the foregoing reasons, we hold that Biros's claims are without merit. We also reverse the district court's grant of the writ as to Biros's sentence. The petition for a writ of habeas corpus is denied.