**NOT RECOMMENDED FOR PUBLICATION**
File Name: 06a0101n.06
Filed: February 9, 2006

**No. 04-2052**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

RUSSELL CASNAVE,

     Petitioner-Appellant,

v.

FABIAN LAVIGNE,

     Respondent-Appellee.

                                 /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN MICHIGAN

**BEFORE:**    **SILER, CLAY AND ROGERS, Circuit Judges.**

     **CLAY, Circuit Judge.** Petitioner, Russell Casnave, appeals the district court's denial of his § 2254 habeas petition, following Petitioner's conviction for second-degree murder and the imposition upon him of a sentence of thirty to fifty years imprisonment. Petitioner seeks relief on the grounds that the state trial court should have suppressed self-incriminating statements taken without *Miranda* warning, and that the jury instructions should have instructed the jury to consider the lesser included offense of voluntary manslaughter. For the reasons stated in this opinion, we **AFFIRM** the district court's denial of Petitioner's habeas petition.

I.

The underlying facts of this case are largely undisputed. Kattura Ogburn Carter ("Carter") was married to Vincent Carter ("Vincent") and the two resided in Chicago. Kattura Carter's daughter lived in Benton Harbor, Michigan with family. In December 1996, Carter traveled alone to Benton Harbor to visit her family for Christmas. While in Benton Harbor, she stayed with her sister Joni Rudley ("Rudley"). Carter was having an affair with Petitioner and also spent time at his home while in Benton Harbor. Rudley was aware of Carter's affair with Petitioner and often visited Petitioner's house with Carter to drink alcohol and smoke marijuana. According to Rudley, there was conflict between Carter and Petitioner about whether Carter would leave her husband.

Around New Year's Eve, Vincent traveled to Benton Harbor, but he stayed with his grandfather. On the morning of January 6, 1997, Vincent called Carter at Rudley's house to make arrangements to return to Chicago, but was informed that Carter was not there. Carter had borrowed Rudley's maroon Dodge Dynasty around 2:00 p.m. to go to Petitioner's house to pick up her belongings. After not hearing from Carter all day, Vincent went to Rudley's house to see if something was wrong. Rudley told Vincent that Carter had phoned earlier that afternoon to say that she was on her way back, but never arrived. At Vincent's urging, Rudley called Petitioner to ask about Carter, and Petitioner told Rudley that Carter had left and was on her way to meet Vincent. Vincent called the police and reported Carter missing, but the police could not respond until she had been missing for twenty-four hours.

On January 9, 1997, the police found the Dodge Dynasty that Carter had been driving abandoned in a driveway in Benton Harbor, with blood on the trunk. Rudley told the police that Petitioner was the last person to see Carter alive. Benton Harbor Police Chief Street and two other

2

officers located Petitioner at his grandmother's house at approximately 7:00 p.m. on January 9, 1997. Petitioner opened the door and invited the officers inside the home. Once inside, the officers told Petitioner that they wanted to ask him some questions about Kattura Carter, and asked him to accompany them to Benton Harbor Police Department. Petitioner complied, and he was told by Police Chief Street that he was not under arrest. Chief Street also informed Petitioner that he would personally drive Petitioner back home after the interview. Petitioner was not handcuffed, and he was told that he could leave anytime he wanted.

At the Benton Harbor Police Department, Chief Street and Detectives Robert O'Brien and Tim O'Brien took Petitioner into an interview room. Detective Robert O'Brien advised Petitioner again that he was not under arrest and that he was free to go at any time. Petitioner told the officers that he had last seen Carter on Monday afternoon and that he loved her and would never harm her. The detectives told Petitioner that they had found Carter's car with what appeared to be blood on the trunk. Detective Robert O'Brien then told Petitioner that he felt "there might be something more that [Petitioner] could add to this that would be important." (J.A. at 88.) At this point, Petitioner asked if he could talk to Detective Robert O'Brien alone.

The other two officers left the room. Once alone, Petitioner told Detective Robert O'Brien that he wanted to "tell him something very horrible." Petitioner then went on to say that "he loved [Kattura] very much and that what he was about to tell [Detective O'Brien] was very terrible and it was an accident." (J.A. at 144.) Petitioner then stated that Kattura Carter was no longer alive. Petitioner claimed that there were parts that he could not remember, but he did remember where the body was located and that he could take Detective Robert O'Brien to the body. When asked how

Carter died, Petitioner said that he did not know but that he believed it was a hammer. Petitioner said that he did not know how he came to be in possession of the hammer because he "blacked out." (J.A. at 145.) Detective Robert O'Brien stopped Petitioner from making any more statements at that point but told Petitioner that he wanted to make sure that they "got Kattura to a proper place because the weather was very bad outside." (J.A. at 145.) Petitioner stated that it would be easier for him to show Detective O'Brien where the body was than to tell him. Petitioner then asked for the other two officers to come back into the room because he wanted to apologize to them for lying before. The other officers returned and Petitioner apologized for not telling them the truth before about what happened to Carter and stated that he wanted to take them to the body. (J.A. at 146.)

Petitioner rode with several police officers down to Farmer Street where Petitioner led the officers to Carter's body. Petitioner rode in the back of a police car and directed the officers where to go. Once the body was recovered, Petitioner was taken back to the police station, given his *Miranda* rights, and placed under arrest. At approximately 8:45 p.m., Petitioner waived his *Miranda* rights and gave a full statement to the police without an attorney present.

After Petitioner was bound over for trial, his counsel moved to suppress his statement to the police, asserting that Petitioner was in custody and should have been advised of his *Miranda* rights earlier. The trial court denied the motion, finding that Petitioner was not in custody and was at all times aware of his freedom of action. At the close of the people's case, the trial court granted a directed verdict on the charge of first degree murder, finding the evidence insufficient to establish premeditation and deliberation beyond a reasonable doubt. At the close of proofs, the jury was instructed on second-degree murder and voluntary manslaughter. The Berrien County jury

4

convicted Petitioner of second-degree murder on October 15, 1997. Petitioner was sentenced on December 1, 1997 to a thirty to fifty year term of imprisonment as a third habitual offender.

Petitioner appealed as of right to the Michigan Court of Appeals. The Michigan Court of Appeals found that there was no *Miranda* violation, and also that since Petitioner failed to object to the jury instruction at trial, appellate review was precluded absent manifest injustice, which they did not find. Petitioner next filed an application for leave to appeal to the Michigan Supreme Court, raising the same *Miranda* and jury instructions claims. On December 12, 2000, the Michigan Supreme Court issued an order denying Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed.

On December 12, 2001, Petitioner then filed a *pro se* § 2254 habeas petition with the United States District Court for the Western District of Michigan. Petitioner sought relief on two grounds: 1) violation of his state and federal rights against self-incrimination; and 2) that the trial court wrongfully instructed the jury to return a verdict on second degree murder. On March 17, 2004, the magistrate judge recommended that the petition be denied. On August 11, 2004, the district court approved and adopted the magistrate's report and recommendation and denied Petitioner's request for habeas relief.

## II.

In habeas appeals, we review the district court's legal conclusions *de novo* and the factual findings for clear error. *Jordan v. Hurley*, 397 F.3d 360, 362 (6th Cir. 2005). However, post-AEDPA,

> "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State Court shall not be granted with respect to any

5

> claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States."

28 U.S.C. § 2254 (d)(1).   The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's conviction] became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001). "For purposes of 28 U.S.C. § 2254 (d)(1), clearly established law . . . 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

The state court decision can be "contrary to" "clearly established federal law" if: it applies a rule that contradicts the governing law set forth in Supreme Court cases; or the state court decision confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor*, 529 U.S. at 407; *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001).   The state court decision constitutes an "unreasonable application" of "clearly established federal law" where the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular state prisoner's case; or  the state court either unreasonably extends a legal principle from a Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. at 406; *Bailey*, 271 F.3d at 655.   A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment

that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411. Rather, the issue is whether the state court's application of clearly established federal law is "objectively reasonable." *Id.* at 410.

The AEDPA requires heightened respect for state court factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254 (e)(1).

III.

Whether a defendant is "in custody" is a mixed question of law and fact and therefore is subject to *de novo* review. *Biros v. Bagley*, 422 F.3d 379, 389 (6th Cir. 2005) (citing *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998)).

In order to decide whether the state court violated clearly established federal law in deciding that Petitioner was not in custody for *Miranda* purposes, it is important to consider the relevant clearly established federal law. The Supreme Court stated in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), that warnings are required when a defendant is the subject of custodial interrogation. According to the *Miranda* Court, custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*.

The Court applied the *Miranda* custody test for the first time in *Oregon v. Mathiason*, 429 U.S. 492 (1977). Defendant Mathiason was a suspect in the theft from a residence near Pendleton, Oregon. Police tried several times to contact Mathiason with no success, and after about 25 days,

an officer left his card at Mathiason's apartment along with a note asking Mathiason to call him. *Id*. at 493. Mathiason telephoned the officer the next afternoon and the officer asked where it would be convenient for them to meet. *Id*. Mathiason indicated no preference, so the officer asked Mathiason to meet him at the station. *Id*. Mathiason complied and met the officer at the station, where he was taken into a room and told that he was not under arrest. The officer then informed Mathiason that he believed Mathiason was involved in the burglary and (falsely) stated that Mathiason's fingerprints were found at the scene. *Id*. After a few moments, Mathiason confessed to having taken the property. *Id*. The officer then advised Mathiason of his *Miranda* rights and allowed Mathiason to leave. *Id*. at 493-94. The Supreme Court held that "it is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way,'" at the time he confessed, and therefore *Miranda* warnings were not required. *Id*. at 495 (internal citation omitted). The Court further opined that "such a noncustodial situation is not converted into one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive environment." *Id*. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it . . . but police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed . . . because the questioned person is one whom the police suspect." *Id*.

In *California v. Beheler*, 463 U.S. 1121 (1983), the defendant Beheler and several of his acquaintances attempted to steal hashish from Peggy Dean, a drug dealer who was selling the drug in the parking lot of a liquor store. *Id*. at 1122. Beheler's step-brother, Danny Wilbanks, killed

Dean when she refused to relinquish the drug. *Id*. Beheler called the police, told them that Wilbanks had killed Dean, and showed police where the gun was hidden in his [Beheler's] backyard. *Id*. Beheler voluntarily accompanied police to the station, where he was told that he was not under arrest. *Id*. During a thirty-minute interview, during which time Beheler was not read his *Miranda* rights, Beheler told police all the details of the murder. *Id*. Beheler was released, but was arrested five days later in connection with Dean's murder. *Id*. Beheler was read his *Miranda* rights at that time, but he waived his rights and gave a second taped confession. *Id*. The Supreme Court, relying upon its decision in *Mathiason*, held that it was "beyond doubt that Beheler was neither taken into custody nor significantly deprived of his freedom of action." *Id*. at 1123. ("Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of a degree associated with a formal arrest.").

In *Stansbury v. California*, 511 U.S. 318, 320 (1996), the Supreme Court clarified its view that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." In *Stansbury*, ten-year-old Robyn Jackson disappeared from a playground in Baldwin Park, California late one afternoon and her body was later found in a flood control channel ten miles away in Pasadena. *Id*. at 319. Witness interviews revealed that Robyn had talked to two ice cream truck drivers, including defendant Stansbury, in the hours before her disappearance. *Id*. at 320. Several plainclothes officers went to Stansbury's home at 11:00 in the evening. *Id*. The

officers told Stansbury that they were investigating a homicide and asked if he would accompany them to the station to answer some questions. *Id*. Stansbury agreed and rode to the station in the front seat of the detective's car. *Id*. At the station, a police lieutenant and another officer questioned Stansbury about his whereabouts and activities on the day that Robyn disappeared, without giving Stansbury *Miranda* warnings. *Id*. Stansbury admitted that he had spoken to the victim, but then stated that he returned home to his trailer and left at about midnight in his housemate's turquoise car. *Id*. This detail aroused the suspicion of one of the officers because a witness had previously told police that he saw a man driving a turquoise car throw something into the channel. *Id*. After Stansbury admitted to prior convictions for rape, kidnaping, and child molestation, the officers terminated the interview and Stansbury was advised of his rights and subsequently arrested. *Id*. In ruling that Stansbury was not in custody for *Miranda* purposes, the Supreme Court held that although "an officer's knowledge or beliefs may bear upon the custody issue if they are conveyed . . . to the individual being questioned . . . those beliefs are relevant only to the extent that they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id*. at 320 (internal citations and quotations omitted). *See also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (stating that the custody determination hinges upon whether, "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave");*United States v. Crossley*, 224 F.3d 847, 861(6th Cir. 2000) (internal citations and quotations omitted) ("In evaluating whether a defendant was in custodial interrogation, we look to the totality

of the circumstances to determine how a reasonable man in the suspect's position would have understood the situation."); and *United States v. Mahan*, 190 F.3d 416, 421 (6th Cir. 1999).

Most recently, in *Yarborough v. Alvarado,* 541 U.S. 625 (2005), the Supreme Court has specifically addressed the issue that is presently before this Court, namely, whether a state-court adjudication of a *Miranda* claim involved an unreasonable application of clearly established law when the state trial court concluded that the defendant Alvarado was not in custody. In *Alvarado*, the then seventeen-year-old Michael Alvarado was part of an attempted carjacking that ended in the murder of the driver of the truck. *Id*. at 656. Alvarado was not the trigger man, but was an accomplice to the carjacking. About one month after the incident, a Los Angeles sheriff investigating the murder called and left word at Alvarado's house and with his mother that she wished to speak to Alvarado. Alvarado's parents accompanied him to the police station and were told to wait in the lobby while the sheriff interviewed Alvardao for two hours. *Id.* During this interview, Alvarado was not given *Miranda* warnings. Alvarado initially denied any knowledge or involvement in the murder, even though the sheriff continually insisted that Alvarado was involved, stating at various points that she knew that Alvarado was involved and that she had witnesses who were saying that he was involved. *Id*. at 657. At this point, Alvarado slowly started to change his story, admitting to being present during the carjacking, but disavowing knowledge of what had actually happened or who had the gun. *Id.* The sheriff then changed tactics and started appealing to Alvarado to help bring the killer to justice, stating, "I know it's very difficult when it comes time to 'drop the dime' on somebody . . . but if that had been your parent, your mother, or your brother, or your sister, you would darn well want [the killer] to go to jail ´cause no one has the right to take

11

someone's life like that.'" *Id*. at 657-58. Alvarado finally admitted to taking part in helping to steal the truck, and he also identified the gunman and told police that he had helped hide the gun after the murder. *Id*. Alvarado was subsequently released to go home with his parents and was charged a few months later, along with the gunman, with attempted robbery and murder.

At trial, Alvarado sought to suppress the statements from the interview, but the trial court denied the motion on the ground that the interview was noncustodial. *Id*. at 658. On direct appeal of his second degree murder conviction, the state appellate court also rejected Alvarado's *Miranda* claim and found that Alvarado was not in custody during the interview so no warnings were required. *Id*. at 659. Alvarado then filed a § 2254 habeas petition in the U.S. District Court for the Central District of California, which was denied on the ground that Alvarado was not in custody for *Miranda* purposes during the interview. *Id*. The district court expressed reluctance to overturn the state court's decision under the highly deferential AEDPA standard.

The Supreme Court granted certiorari to decide whether the state court had unreasonably applied clearly established federal law in ruling that Alvarado was not in custody for *Miranda* purposes. *Id*. In answering that question, the Court recognized that "the range of reasonable judgment can depend in part on the nature of the relevant rule." *Id*. at 664. The Court said that some rules will be specific, thus the range may be narrow, and the application of the rule may be plainly correct or incorrect. *Id*. Other rules may be more general, requiring a substantial element of judgment, and "[t]he more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Id*. On the basis of those principles, the *Alvarado* Court concluded that the state court's application of clearly established law was reasonable because "fair-minded

jurists could disagree over whether Alvarado was in custody." *Id*. The Supreme Court found that the following facts weighed against a determination of custody: Alvarado was not transported to the station by the police or required to appear at a certain time; he was not threatened with arrest; his parents remained in the lobby during the interview, suggesting brevity; the sheriff focused on the other suspect's crimes, not Alvarado's, during the interview; he was offered several times to take a break; and the sheriff appealed to Alvarado's interest in telling the truth rather than threatening him with arrest. *Id.* According to the Court, "all of these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." *Id*. at 654-65. On the other hand, the Court noted that several factors weighed in favor of finding that Alvarado was in custody, including the following facts: the interview occurred at the station; the interview lasted two hours; Alvarado was not told that he was free to leave; Alvarado was transported to the station by his legal guardians, not on his own accord; Alvarado's parents apparently requested to be present during the interview but were rebuffed. *Id*. at 665. The Court found that these facts "might reasonably have led someone in Alvarado's position to feel more restricted than otherwise" and "weigh in favor of the view that Alvarado was in custody." *Id*.

The *Alvarado* Court ultimately rejected the notion that the state court's custody determination was unreasonable, stating that:

> [t]he custody test is general, and the state court's application of our law fits within the matrix of our prior decision. We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter. A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly.

13

*Id.* at 666.

Similarly, in the present case, we believe that reasonable jurists could disagree as to whether Petitioner was in custody during his interrogation; therefore, we do not find that the state court unreasonably applied clearly established federal law in determining that Petitioner was not in custody. The objective facts and circumstances of the case do support the state court's determination of non-custody.

Three officers went to Petitioner's residence at about 7:00 p.m. on the night in question, and Petitioner, who was the last person to see the victim alive, voluntarily agreed to accompany the officers to the police station to discuss Carter's disappearance. The Police Chief specifically told Petitioner that he was "not under arrest for anything," and the officers assured Petitioner that he would be driven home after the interview. At the police station, Petitioner was taken to an interview room where two other officers were waiting to interview him. Petitioner was told at the outset that he was free to go and that he could leave if he wanted. The officers proceeded to question Petitioner about his relationship with Carter and Petitioner's knowledge of her whereabouts. Petitioner was never accused of anything, and Petitioner never asked to leave the interview room or to make a telephone call. Notably, Petitioner was also seated near the door, a factor that the Sixth Circuit has considered when making a determination of custody in a *Miranda* case. *See Mahan*, 190 F.3d at 421-22; *Biros*, 422 F.3d at 389.

After only a few minutes alone in the room with the three officers, Petitioner requested and was granted permission to speak to Officer Detective O'Brien alone. Once the two were alone, Petitioner, without any prompting, told the detective that he "wanted to tell him something very

horrible that had happened." (J.A. at 144.) Petitioner went on to state that it was an accident, that Kattura was no longer alive, and that there was a struggle. Petitioner then volunteered to take police to the Carter's body. After apologizing to the other officers for not having told them the truth about what had happened, Petitioner directed police to the location of Carter's body. Thereafter, Petitioner was immediately taken to the police station where he was given *Miranda* warnings and placed under arrest. Petitioner then waived his rights and gave the police a full confession. The facts of this case are similar enough to the factual situations of the Supreme Court cases cited above to make the state court's determination that Petitioner was not in custody reasonable. Therefore, we decline to substitute our judgment for that of the state court.

IV.

Petitioner claims that the state trial court gave an improper jury instruction when it instructed the jurors that they could stop deliberations once they agreed that the elements of second-degree murder were met, without considering whether a verdict of voluntary manslaughter was warranted. Petitioner failed to object to the jury instruction at trial; therefore Petitioner is procedurally barred from habeas review unless he can show cause and prejudice. When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).

This Court has "previously explained that procedural default results where three elements are satisfied: (1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; (2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review

of a federal constitutional claim." *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003); *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "A procedural default may be excused, however, if the petitioner demonstrates that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case." *Id*; *see also Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991); and *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000). Even if Petitioner was not procedurally barred, he would still have to establish that the jury instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

Under the Michigan contemporaneous objection rule, "instructional error should not be considered on appeal unless the issue has been preserved by an objection to the instruction in the trial court." *People v. Handley*, 415 Mich. 356, 329 N.W.2d 710, 712 (Mich. 1982). Petitioner failed to object to the instructions at trial, therefore the first prong of the Sixth Circuit procedural default test is met. The second and third elements of this Court's test are also met because the evidence establishes that the Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. The Michigan Court of Appeals noted Petitioner's procedural default and applied a manifest injustice standard of review, stating: "Because defendant failed to object to the jury instruction, appellate review is precluded absent manifest injustice." (J.A. at 61.) Furthermore, Michigan's contemporaneous objection rule certainly qualifies as an "independent and adequate" state ground, and is a rule designed to arm trial judges with the information needed to rule reliably. *See Lancaster v. Adams*, 324 F.3d 423, 437 (6th Cir. 2003) . The rule also "constitutes an independent and adequate state ground on which to foreclose

16

habeas review because the rule was 'firmly established and regularly followed' at the time it was applied in [Petitioner's] case." *Willis v. Smith*, 351 F.3d at 745 (quoting *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998)). Petitioner's failure to comply with the state's independent and adequate state procedural rule caused him to default his claim in state court, thereby barring his claim on appeal to this Court.

The analysis must now turn to the question of whether Petitioner has demonstrated cause and prejudice for failing to comply with the rule. When a petitioner has procedurally defaulted a claim or issue in the state courts, the federal habeas court will entertain the defaulted issue only if the petitioner can show "cause" for the procedural default and "actual prejudice" as a result of the alleged federal violation. *Coleman v. Thompson*, 501 U.S. at 750; *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999); *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994). Petitioner has not argued the issue of procedural default at all, therefore this Court cannot find "cause" nor "actual prejudice" for the alleged violation.

This means that we now only have to consider whether a manifest injustice would result from this Court enforcing the procedural default. "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on appeal. The question in such a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Henderson v. Kibbe*, 431 U.S. at 154 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

17

Petitioner does not meet this high burden because the judge properly instructed the jury on the charges of second-degree murder and the lesser offense of voluntary manslaughter. Petitioner argues that the jurors were precluded from considering the lesser offense of voluntary manslaughter because they were instructed that if they agreed that the elements of second-degree murder were met they could stop their deliberations before considering the elements of voluntary manslaughter. This argument is without merit. The state trial court instructed the jurors in a manner that is not only constitutional but that fully complies with Michigan state law. Michigan law requires that in murder prosecutions, the jury "must be told to consider the principal charge first." *Handley*, 329 N.W.2d at 712. It should then be instructed that if it fails to convict or acquit or is unable to agree on that offense, it may turn to the lesser offenses. *Id.*

In the present case, the jury was first instructed on the charge of second-degree murder and told that the prosecutor must prove three elements beyond a reasonable doubt. The jury was told that the prosecutor had to have prove: 1) that the defendant caused the death of Kattura Carter; 2) that the defendant had the requisite state of mind; and 3) that the killing was not committed under circumstances that reduce it to a lesser crime. (J.A. at 168.) The jury was then told that "the crime of murder may be reduced to voluntary manslaughter if the defendant acted out of passion or anger brought about by adequate cause and before the defendant had a reasonable time to calm down." (J.A. at 168.) The jury was further told the elements of voluntary manslaughter. (J.A. at 168-69.) The judge then went on to state to the jury,

> You must first consider the crime of second-degree murder. If you agree that the defendant is guilty of that crime, you may stop your discussions and return your verdict. If you believe that the defendant is not guilty of second-degree murder, or if you cannot agree about that crime, you should consider the less serious crime of

18

voluntary manslaughter. You decide how long to spend on the crime of second-degree murder before discussing the crime of voluntary manslaughter. You can go back to the crime of second-degree murder after discussing the less serious charges if you want to do so.

(J.A. at 169-70.)

Petitioner was not prejudiced here because the trial court properly instructed the jury, as part of its murder deliberations, to consider whether circumstances would justify reduction to a less serious crime. The fact that the judge required the jury to consider second-degree murder before the lesser included offense, does not present a manifest injustice. Michigan law specifically requires that the jury be instructed this way. The trial court followed state law, properly instructed the jury, and we do not believe that there was a manifest injustice.

## III.

For the foregoing reasons, we **AFFIRM** the district court's denial of Petitioner's § 2254 habeas petition.