RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0122p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CLARENCE CARTER,

*Petitioner-Appellant,*

*v.*

No. 99-3207

BETTY MITCHELL, Warden,

*Respondent-Appellee.*

>

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 96-00426—Sandra S. Beckwith, Chief District Judge.

Argued: April 28, 2005

Decided and Filed: April 6, 2006

Before: BOGGS, Chief Judge; SUHRHEINRICH and DAUGHTREY, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Linda E. Prucha, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Henry G. Appel, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Linda E. Prucha, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Henry G. Appel, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee.

———————

## OPINION

———————

SUHRHEINRICH, Circuit Judge. Petitioner-Appellant Clarence Carter, an Ohio prisoner under sentence of death, appeals the order of the district court dismissing his petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. On appeal, he raises several claims challenging trial counsel's effectiveness, and also challenges the prosecutor's conduct and the sufficiency of the evidence in light of newly discovered evidence. For the reasons that follow, we **AFFIRM** the district court's denial of Carter's petition.

1

## I.  Facts and Procedural History

On direct appeal, the Ohio Supreme Court made the following findings of fact:

> In December 1988, Clarence Carter, defendant-appellant, and Johnny Allen were inmates in Range "E" at the Jail Annex to the Hamilton County Courthouse. Allen was being held on a theft offense. Carter had been found guilty of aggravated murder on December 9, 1988, and was awaiting sentencing. On December 28, Carter struck and kicked Allen numerous times over a twenty to twenty-five minute period, necessitating Allen's hospitalization. On January 5, 1989, Carter was sentenced to life imprisonment for the prior aggravated murder. On January 11, 1989, Allen died as a result of Carter's assault.
>
> Inmate Joseph Carroll testified that he and Allen were watching television on a mid-December evening when Carter came in and switched channels. Allen said to Carter, "Don't we vote on this?" Without saying anything, Carter punched Allen in the eye, then resumed watching television. Allen left to clean up the blood flowing from a cut above his eyebrow. Inmates Calvin Johnson and Phillip Brewer confirm that Allen and Carter exchanged words, and that Carter struck Allen. However, Johnson and Brewer assert that Carter was watching TV, and Allen changed the channel. Allen did not report this incident to jail authorities.
>
> Carroll further testified that about a week before December 28, Carter found a broken metal spoon handle in a hole in the shower ceiling. After a brief discussion with Brewer, Carter returned the handle to its hiding place.
>
> On December 28, after lunch, Johnson saw Carter retrieve the metal handle from the shower ceiling. Johnson asked Carter what he was going to do. Carter did not reply. About ten minutes later, around 1:10 p.m., the confrontation which led to Allen's death began in "E" range, a common area into which approximately twelve cells open.
>
> According to Carroll, Allen was in his cell when Carter told him it was his turn to sweep the floor. As Allen walked past Carter to get a broom, Carter "jumped on him, punched him, [and] knocked him down." As Allen lay on the floor, Carter "leaned over him, punched him, kicked him and choked him." Several times during the assault Carter stopped and walked away before returning to the attack. Twice he used a mop to wipe blood off his tennis shoes. During the assault Carroll said to Carter, "[d]amn C.C., you don't like him, do you." Carter replied "no," and went "back down to where Johnny Allen was, punched him, kicked him some more, stomped on him."
>
> After the second beating, Allen managed to get up and sit on a bench, but Carter came back, knocked him off the bench, and continued to kick and choke Allen. Allen never threw a punch or provoked Carter.
>
> Inmate Calvin Steele described Carter's initial blow to Allen as a "sucker punch," delivered suddenly and without warning. Carter struck Allen ten or fifteen times. Allen never struck or attempted to strike a blow at Carter. At one point, Carter returned to his cell and stuck his own leg with some kind of object; he then came back and stomped on Allen's head with his foot. Carter's assault on Allen lasted twenty or twenty-five minutes. When Steele asked Carter to stop, Carter told Steele to "[g]et my ass back downstairs." (Steele was standing outside the range in the "bull run," the guard's access way.)
>
> Richard Cunningham saw Carter hit Allen four or five times, then choke Allen, who lay on the floor. As he was beating Allen, Carter said, "[t]hat m . . . . . f . . . . . tried to stab me." Carter seemed to be in a rage, but appeared to know what he was doing.

Cunningham testified that "Carter started kicking him [Allen] down the range by his head, and by his ribs, and . . . he was pulling his head in my bars and stomping his head like a pop can on the floor. And his head was bouncing up off the floor. Blood was everywhere. Guys was on the range saying: Come on, CC, you are going to kill the man. Quit. Leave him alone. . . . Carter wouldn't let up. He kept on doing it and doing it, he wouldn't quit."

Carter claimed that Allen assaulted him with the shank and that he, Carter, merely defended himself, being carried away with rage. According to inmate Robert Chapman, a defense witness, the fight began when Allen, holding the metal spoon handle, began hitting Carter. However, Chapman acknowledged that he previously told investigators he was asleep. Howard "Tub" Burns, a high school friend of Carter, heard Carter yell, "Tub, get the police."

Brewer said he saw Carter and Allen arguing on December 28, and Allen was holding some kind of metal object in his hand. After a few seconds, Brewer returned to his cell. He explained, "[i]n a place like that you mind your own business, and that's what I was doing."

Around 1:30 p.m., sheriff's deputies heard unusual noises, like an object being banged against steel bars, and went to investigate. When they arrived at "E" range, they found Allen lying face down on the floor, in a pool of blood. Deputy Raymond J. Loebker saw Carter drop the shank. Loebker described Carter as sweating, breathing heavily, but without any visible signs of injury. Sheriff's Lieutenant John Douglas saw the metal handle on the floor, four feet from Allen, and retrieved it for later examination.

Around 5:00 p.m., on December 28, Carter showed Detective John Hinrichs scratches Carter said he sustained in his fight with Allen. Carter had two or three scratches on his right thigh, scratches on his right arm, and a cut on his chest. None was deep or serious, and only the chest cut showed any sign of possible bleeding. Carter, muscular and strong, was in excellent physical condition.

Forensic examination revealed that Carter's socks, pants, and tennis shoes all contained type "O" human blood. Allen had type "O" blood, but Carter's blood type was not revealed at trial. Carter's T-shirt also had human blood, but the stain was not typed. Forensic examination revealed two human blood stains on the metal shank–one stain was type O, the other was undetermined. The shank had no fingerprints on it.

The jury had to assess the credibility of the principal witnesses under unusual circumstances. Only inmates witnessed the assault, and they all had prior felony records. Additionally, the prosecution made various beneficial arrangements with inmates who testified for the prosecution. Several inmates who testified for the defense had known Carter before they were incarcerated.

When found, Allen was unconscious and had difficulty breathing. His ribs were pulsating, and blood was running out of his mouth. At University Hospital, Doctor Christopher Miller, a resident neurosurgeon, found bruises and lacerations about Allen's head, face, and neck. Blood exuded from behind Allen's eardrums, signifying probable basilary skull fractures. Allen had a low level of brain system reflex functioning and was neither conscious nor able to communicate. Doctors connected life support systems.

Allen had suffered soft tissue swelling between his larynx and spine, but the cervical region was not fractured. A December 28 CAT scan revealed prominent soft tissue swelling over Allen's left front temporal region, a subdural hematoma between the brain's surface and the skull, and diffuse bleeding within the brain. Trauma was the cause of the injuries. However, deprivation of oxygen to Allen's brain could have been an additional factor.

According to Doctor Harry J. Bonnell, Chief Deputy Coroner, Allen's heart and breathing stopped on January 10th, but doctors revived him. A January 11th examination revealed that Allen was brain dead. Doctors then disconnected life support systems.

Dr. Bonnell performed an autopsy on January 12th. Allen was 5'10", and weighed 122 lbs. He died as a result of multiple bruises and swelling of the brain, caused either by blunt objects striking his head or by his head striking blunt objects. His brain had been deprived of oxygen prior to arrival at the emergency room. His injuries were consistent with his head having been banged against the floor or against steel bars. In Dr. Bonnell's opinion, these injuries were fatal, and Allen would have died within twenty-four hours of the trauma without medical intervention.

*State v. Carter*, 594 N.E.2d 595, 596-98 (Ohio 1992) (all alterations in original).

A jury found Carter guilty of aggravated murder with prior calculation and design. *Id.* at 598. Carter stipulated to the first death-penalty specification that the offense occurred while Carter was a prisoner in a detention facility. *Id.* The second specification, that Carter was previously convicted of an offense an essential element of which is the purposeful killing of another, was tried to the court, which ultimately found Carter guilty. *Id.*

The only evidence Carter submitted at mitigation was his own statement. *Id.* at 602. The jury recommended a capital sentence. *Id.* at 598. The trial court adopted the recommendation and sentenced Carter to death. *Id.*

Carter appealed, arguing, inter alia, ineffective assistance of trial counsel, intervening cause of death, and insufficiency of evidence. The Ohio Court of Appeals affirmed the conviction and sentence, *State v. Carter*, No. C-890513, 1991 WL 17218 (Ohio Ct. App. Feb. 13, 1991), as did the Ohio Supreme Court, *State v. Carter*, 594 N.E.2d at 603.

Carter filed an application to reopen his appeal with the Ohio Court of Appeals under Ohio Appellate Rule 26(B). That court denied the application as untimely, *State v. Carter*, No. C-890513 (Ohio Ct. App. Apr. 22, 1994), and the Ohio Supreme Court affirmed, *State v. Carter*, 640 N.E.2d 811 (Ohio 1994). In 1993, Carter filed a petition for post-conviction relief, alleging four grounds of ineffective assistance of counsel, alleging that the prosecutor improperly presented false testimony, and alleging that he should receive a new trial based on newly discovered evidence. In support, he presented affidavits of family members, mental health experts, and witnesses to the altercation with Johnny Allen. The trial court denied this petition and a successive petition. The Ohio Court of Appeals affirmed the denial of both petitions, *State v. Carter*, Nos. C-940375, C-940835 (Ohio Ct. App. Oct. 4, 1995), and the Ohio Supreme Court denied further review, *State v. Carter*, No. 95-2361 (Ohio Mar. 6, 1996).

On April 18, 1996, Carter filed with the district court a motion for the appointment of counsel and notice of intent to file a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Carter filed his habeas petition in July 1996. The district court dismissed as meritless all but two of Carter's seventy claims for relief. The district court held an evidentiary hearing on the remaining two claims. The court concluded that those claims were also without merit and dismissed Carter's petition. Carter timely appealed to this Court.

This Court granted a certificate of appealability on six claims in Carter's § 2254 petition: (1) that Carter's trial counsel[1] rendered ineffective assistance by waiving a mental examination for

---

[1] Carter had more than one attorney representing him at trial. For simplicity, we will refer to them collectively as a singular "trial counsel."

Carter and not employing a mental health expert; (2) that Carter's trial counsel rendered ineffective assistance by not requesting the expert assistance of a neuropsychologist; (3) that Carter's trial counsel rendered ineffective assistance by not presenting certain mitigating evidence and testimony during the sentencing phase; (4) that Carter's trial counsel rendered ineffective assistance by failing to present evidence that Carter's beating of the victim lasted only ten to thirteen minutes, and that the prosecutor withheld evidence of this fact; (5) that the prosecutor improperly presented false testimony at trial; and (6) that Carter should receive a new trial because newly discovered evidence reveals that insufficient evidence exists to support his aggravated murder conviction.

## II. Standard of Review

The standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), applies to all § 2254 petitions filed after the AEDPA's effective date (April 24, 1996), even if the petitioner had filed preliminary motions in the district court prior to the effective date. *Woodford v. Garceau*, 538 U.S. 202, 210 (2003). Although Carter filed his initial motion for the appointment of counsel and notice of intent to file a petition for a writ of habeas corpus prior to the effective date, he did not file his petition until after the effective date. Thus, the AEDPA governs this Court's review of Carter's appeal.

In an appeal from a denial of habeas relief under the AEDPA, this Court reviews a district court's legal conclusions de novo and its factual findings for clear error. *Hill v. Hofbauer*, 337 F.3d 706, 710 (6th Cir. 2003). Where the district court does not make independent factual findings, the factual findings are reviewed de novo. *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir. 2003).

Under the AEDPA, a federal court may not grant a writ of habeas corpus unless it concludes that the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court renders an adjudication "contrary to" clearly established federal law when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court renders an "unreasonable application" of clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Mixed questions of law and fact are reviewed under the "unreasonable application" prong. *Biros v. Bagley*, 422 F.3d 379, 386 (6th Cir. 2005). "Factual findings made by the state court, or by state appellate courts based upon the trial record, are presumed to be correct but may be rebutted by clear and convincing evidence." *Id.*

## III.  Ineffective Assistance of Trial Counsel

Carter raises four claims of ineffective assistance of trial counsel. He alleges that trial counsel rendered ineffective assistance by (1) waiving a mental examination and not employing a mental health expert, (2) not requesting the expert assistance of a neuropsychologist, (3) not

presenting certain mitigating evidence and testimony during the sentencing phase,[2] and (4) not presenting evidence that Carter's beating of the victim lasted only ten to thirteen minutes.

To prove ineffective assistance of counsel, a petitioner must show deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland* requires that reviewing courts be highly deferential of counsel's performance. *Id.* at 689. Counsel renders ineffective assistance when his performance "f[alls] below an objective standard of reasonableness," *id.* at 688, but there is a "strong presumption" that counsel's performance was professionally reasonable, *id.* at 689. Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Although this is a high burden for a petitioner to satisfy, it is even higher for a petitioner proceeding under the AEDPA:

> For [a petitioner] to succeed, . . . he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the [state] Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Bell v. Cone*, 535 U.S. 685, 698-99 (2002) (internal citation omitted).

In its post-conviction ruling, the Ohio Court of Appeals "conclude[d], on the state of this record, that through his evidentiary materials, Carter has failed to demonstrate that the conduct of his trial counsel was either ineffective or prejudicial." *State v. Carter*, Nos. C-940375, C-940835, at *9 (Ohio Ct. App. Oct. 4, 1995). It therefore held "that the trial court [had] correctly determined that an evidentiary hearing was not warranted regarding any of Carter's ineffective-assistance-of-counsel claims." *Id.* at *10. We now examine whether this conclusion was contrary to or involved an unreasonable application of clearly established federal law.

### A. Waiver of Mental Examination and Failure to Employ a Mental Health Expert

Carter claims that trial counsel rendered ineffective assistance by waiving a mental examination and not employing a mental health expert.

Carter's waiver claim is wholly without merit. The "waiver" in question was trial counsel's waiver of a mental examination offered by the trial court *prior to sentencing*. This does not demonstrate that trial counsel unreasonably investigated Carter's mental state, because, by that point in the proceedings, trial counsel had already retained the services of a psychologist, Dr. Kenneth Manges. Carter conceded as much in his post-conviction petition and in his brief to this Court. (Petr.'s Br. 30 n.1 (stating that "Carter noted in his post-conviction petition that correspondence in his trial attorney's file indicated that [trial] counsel had contacted a Dr. Manges").)

Thus, Carter's only avenue for success on this claim is to show that trial counsel's decision to retain *Dr. Manges* was somehow objectively unreasonable, because, according to Carter, "Dr. Manges, [a vocational psychologist,] was not qualified to be a mitigating expert in a capital case." However, as the government points out, Dr. Manges has received an advanced certification in

---

[2] The district court erroneously concluded that the first three ineffective assistance claims were procedurally defaulted and, thus, did not reach the merits. The highest state court to review the case dismissed the claims on the merits and not on the basis of procedural default, and the government concedes that these claims are not procedurally defaulted. (Respt.'s Br. 28.)

forensic psychology from the University of Virginia[3] and has testified as a mental health expert in the Ohio state courts. *See, e.g.*, *State v. Mackey*, No. CA99-06-065, 2000 WL 190033, at *4 (Ohio Ct. App. Feb. 14, 2000) (noting Dr. Manges's opinion that the defendant was mentally unable to assist in her own defense). Therefore, we cannot say that the state court erred in concluding that trial counsel did not render ineffective assistance by hiring Dr. Manges.

While the Supreme Court has held that a criminal defendant is entitled to the assistance of a competent psychiatrist if the defendant can demonstrate that his sanity will be a significant issue at trial, *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985), the Court has never stated as a per se rule that a particular type of mental health expert is required in death penalty cases. Further, although this court has extended *Ake* to require an "independent" psychiatrist rather than a neutral, court-appointed psychiatrist when a defendant's mental health is in issue, *see Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003), we also have never held that a defendant is entitled to a particular type of expert. *Cf. Lundgren v. Mitchell*, – F.3d –, No. 02-3001, slip op. at 14-15 (6th Cir. March 13, 2006) ("A licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary.).

*Ake* and *Powell* are inapposite nonetheless. As the *Ake* Court was careful to note, "[a] defendant's mental condition is not necessarily at issue in every criminal proceeding, . . . and it is unlikely that psychiatric assistance of the kind we have described would be of probable value in cases where it is not." *Ake*, 470 U.S. at 82. In *Ake*, the defendant's mental health was at issue because his sole defense was insanity, his behavior was so strange that the trial court had him examined for competency, a state psychiatrist found him incompetent to stand trial and recommended that he be committed, Ake was competent only when sedated, the state psychiatrists described a severe mental illness that may have existed for years, and the prosecutor submitted evidence of Ake's future dangerousness through the testimony of the state's own psychiatrists. *Id.* at 86. Quite simply, none of those circumstances was present in Carter's trial.

As for *Powell*, we first note that it was a pre-AEDPA decision whose holding has never been adopted by the Supreme Court. Thus, *Powell* can have no legal effect on post-AEDPA habeas cases. *See* 28 U.S.C. § 2254(d) (defining "clearly established Federal law" for purposes of the AEDPA analysis as the law "as determined by the Supreme Court of the United States"). In any event, *Powell* is also distinguishable on the facts. The trial court in that case granted a defense motion for appointment of a psychiatrist because the court recognized that Powell's "mental competency had been placed in issue" before trial, *Powell*, 332 F.3d at 382, and the court-appointed psychiatrist testified "that neither she nor any other staff member at the court's psychiatric clinic were qualified to conduct the type of testing and evaluation that was required to diagnose [the defendant] with organic brain damage," *id.* at 395. Carter, by contrast, has not shown that his mental health was (or should have been) in issue, nor presented evidence that Dr. Manges was unqualified to conduct the type of testing that Carter claims was necessary. Most importantly, *trial counsel hired Dr. Manges as an independent mental health expert*, which would satisfy *Powell* and *Ake*.

Counsel does not perform unreasonably merely by not ruling out every possible psychological mitigator through specialized evaluations. *Cf. Lundgren*, No. 02-3001, slip op. at 15 (stating that the question before the court "is not whether all mental health experts would agree on whether the defense was viable, but whether counsel's decision not to pursue the defense was a reasonable strategic choice"); *Lorraine v. Coyle*, 291 F.3d 416, 436 (6th Cir. 2002) ("It simply cannot be said that trial counsel's conduct fell below an objective standard of reasonableness under *Strickland* simply because the leads [of possible organic brain damage] led to nowhere."); *Thompson*

---

[3] *See* http://www.mdexonline.com/services/eda/map/edn_ohio/kennethmangesbio.cfm (last visited Feb. 21, 2006).

*v. Cain*, 161 F.3d 802, 813 (5th Cir. 1998) (finding that defense counsel did not render ineffective assistance by not seeking a psychiatric evaluation where there was no evidence of mental instability); *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th Cir. 1995) (finding that defense counsel did not render ineffective assistance by not seeking a "second opinion" where counsel reasonably relied on the results of a psychological examination); *Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992) ("The mere fact that . . . counsel did not shop around for a psychiatrist willing to testify to the presence of more elaborate or grave psychological disorders simply does not constitute ineffective assistance."). Rather, decisions as to which, if any, expert a particular defendant requires are fact sensitive and necessarily vary from case to case. Some death penalty defendants need a neuropsychologist, others a forensic psychologist. Still others need a social psychologist, psychopharmacologist, or mitigation specialist. For this reason, there is not and should not be a per se rule that trial counsel is ineffective at mitigation unless a particular type of expert is retained. On the other hand, to establish ineffective assistance of counsel at mitigation in federal habeas proceedings, there must always be some record evidence presented at the state post-conviction stage (unless cause and prejudice is shown) establishing that an expert should have been, but was not, obtained. Therefore, we again reject the argument that counsel's decision to retain only a vocational or industrial psychologist was per se unreasonable, under any standard of review.

## B. Failure to Retain a Neuropsychologist

Carter also argues that, had trial counsel retained an expert neuropsychologist, the neuropsychologist would have concluded that Carter suffers from organic brain impairment, and that such evidence could have been presented at mitigation to support a lower sentence. In his post-conviction motion, Carter presented affidavits from three mental health experts: Dr. James C. Tanley, Dr. Judith H. Skillings, and Dr. Newton L.P. Jackson. Specifically, Carter argues that a mental health expert "could have put Mr. Carter's life and personality in a context the jury would have understood," and that expert testimony was relevant to whether Carter "'lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law.'" (Petr.'s Br. 39 (quoting *Frazier v. Huffman*, 343 F.3d 780, 793 (6th Cir. 2003)) (alterations in original)).

Dr. Skillings is a clinical psychologist who specializes in chemical dependency and cross-cultural issues. She concluded that Carter's antisocial acts are the result of being subjected to violence and alcoholism during his youth and of the trauma from racial harassment, and are not "per se part of an antisocial personality structure."

However, Dr. Skillings never even met with Carter or any members of his family. Her opinions were based entirely on the affidavits of Carter's family members, the sentencing phase trial transcript, and Carter's school records. An examination of these records shows that many of her findings are questionable, however. For example, Dr. Skillings remarked that there was "little structure or discipline in the home." There is no similar statement from the records Dr. Skillings referenced. To the contrary, Carter's step-father, William Walton, and siblings all mentioned Walton's attempts to strictly discipline the children. Also, Dr. Skillings concluded that Carter was affected by the frequent "violence between his parents." However, George, Jr. was the only family member who mentions any violence between Brenda Walton and George, Sr., saying, "My father may have hit my mother *once or twice*" (emphasis added). To the extent any such incident did occur, it would have been when Carter was still very young, meaning its effects on Carter would be entirely unclear, at least for someone relying entirely upon the limited information before Dr. Skillings.

Dr. Jackson is a forensic psychologist (like Dr. Manges, incidentally). He concluded that Carter suffered from a type of organic brain dysfunction that causes a loss of control during violent

incidents.[4] He also stated that Carter's tests results were inconsistent with those generated by individuals who commit premeditated acts of violence, implying that Carter's attack was likely not premeditated.

Contrary to Dr. Jackson's opinions, the prosecution presented significant evidence at trial that prior to any violent incident, Carter had been planning to attack Allen in retaliation for changing the channels on the jailhouse television. Further, several witnesses testified that Carter had broken off his attack of Allen more than once, only to resume beating him. Inmate Richard Cunningham testified that "Carter kept on beating [Allen] until he heard the [guards'] keys. He heard the keys, he went on back to his cell." In short, the evidence at trial completely contradicts Dr. Jackson's conclusions that Carter lost his self-control during the altercation and that Carter was not likely to have committed a premeditated act of violence.

Dr. Tanley was the only neuropsychologist Carter retained in support of his post-conviction claim that trial counsel rendered ineffective assistance by not hiring a neuropsychologist. Dr. Tanley stated that Carter has difficulty understanding the spoken word and struggles with complex information and novel situations. He ultimately concluded that "a competent clinical psychologist should have recommended a complete neuropsychological evaluation for [Carter]."

Despite Carter's claim that a neuropsychologist would have diagnosed Carter as having organic brain disorder, Dr. Tanley did *not* diagnose Carter as suffering from organic brain dysfunction or brain damage. He stated only that there is a "likelihood" that Carter has "some kind of brain related difficulty." He even admitted that Carter's score on the Impairment Index is "below the normal cutoff . . . for reliably stating that brain damage exists." Carter, then, wholly failed to show any error relating to trial counsel's decision not to hire a neuropsychologist. *See Martin v. Mitchell*, 280 F.3d 594, 613-15 (6th Cir. 2002) (rejecting petitioner's claim of ineffective assistance of counsel where petitioner failed to point to any mitigating evidence defense counsel would have uncovered through further investigation into his background); *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) (rejecting petitioner's claim of ineffective assistance of counsel for failing to discover that petitioner suffered from post traumatic stress disorder ("PTSD"), where petitioner failed to point to anything in the record showing that he actually suffered from PTSD or any other psychological disorder). Trial counsel "cannot be deemed ineffective, since even at this late date, there is no medical *proof* of . . . a [mental] condition." *Lorraine*, 291 F.3d at 439.

Moreover, Dr. Tanley did not provide any temporal relationship between Carter's possible brain damage and his altercation with Johnny Allen. Dr. Tanley evaluated Carter nearly five years after Carter killed Allen, but Dr. Tanley did not address what impact events in the intervening five years could have had on his diagnosis. In other words, Carter failed to show that the brain damage, if any, even existed at the time of the incident.

Finally, Dr. Tanley did not make any connection between Carter's possible brain damage and his violent altercation with Allen. Similarly, the nebulous references in Carter's briefs to Dr. Tanley's diagnosis do not establish a causal link. Carter focuses on Dr. Tanley's statements that Carter performs poorly in novel, complex situations that require thinking through a problem, and has trouble understanding the spoken word. It is difficult to see how Carter's diminished capacity in novel, complex situations and his trouble understanding the spoken word are at all relevant to the

---

[4] Dr. Jackson references a discussion he had with Dr. Tanley regarding their diagnoses of Carter. Curiously, Dr. Jackson suggests that he and Dr. Tanley reached similar clinical conclusions "regarding the presence of indicators of organic brain dysfunction which could have caused . . . Carter, at the time of the altercation with Johnny Allen, to have been unable to alter or control his course of conduct at that time." As noted *infra*, however, Dr. Tanley did not make the connection between Carter's possible brain damage and his violence against Allen, nor did he conclude that Carter suffers from organic brain dysfunction.

events at issue. The evidence at trial showed that Carter had been planning an attack for days. At more than one point during the altercation, Carter ceased beating Allen only to resume a short time later. One witness recounted that at some point Carter went to his cell, stabbed himself in the leg, and returned to continue beating Allen. Another recalled that twice Carter interrupted his beating of Allen to clean his shoes with a mop. In other words, the evidence at trial did not show this to be a "novel, complex situation" that Carter was incapable of thinking through, but rather the act of a calculating, cold-blooded killer. Rather, his preparation and attempts to establish exculpatory circumstances during the event demonstrate that he fully appreciated the situation and its potential consequences.

In *Lorraine*, like here, petitioner claimed his trial counsel rendered ineffective assistance by failing to uncover evidence of organic brain damage. *Id.* at 436. Similarly, petitioner's habeas counsel did not find evidence of organic brain damage. *Id.* The court concluded that "if habeas counsel could not find evidence of organic brain damage, then trial counsel cannot be deemed ineffective . . . . Nor can there be any prejudice." *Id.*

Absent actual, probative evidence relating to Carter's mental health that trial counsel missed, there can be no prejudice and therefore no ineffective assistance of counsel under *Strickland*. In short, Carter offered no evidence to show, under the facts of his case, that trial counsel's decision not to retain a different specialist was objectively unreasonable. We conclude, then, that the Ohio Court of Appeals' decision denying Carter relief on this claims of ineffective assistance of counsel was not contrary to or an unreasonable application of clearly established federal law. Thus, we affirm the denial of the writ on this issue.

## C. Failure to Present Certain Evidence at Mitigation

Next, Carter claims that trial counsel rendered ineffective assistance by not presenting certain mitigating evidence and testimony during the sentencing phase. The only evidence presented at sentencing was Carter's own statement, in which he described being raised by his "troublesome" stepfather, acknowledged his anger problems, and stated that he has since turned to prayer and religion to control his temper and counsel troubled youths. *State v. Carter*, 594 N.E.2d 595, 601 (Ohio 1992). Carter argues that trial counsel should have introduced the testimony of his family members regarding his troubled background, including his experiences with drugs and alcohol at an early age, his history of violent behavior, his experience with racial prejudice, and the influence of his alcoholic, philandering father. In support, Carter has submitted affidavits from his mother, Brenda Walton; his step-father, William Walton; his sister, Marrell; his younger brother, LaMarck; his older brother, George, Jr.; his half-sister, Melissa Walton; and his paternal aunt, Mary Carter Coleman. All of the affiants stated they would have been willing to testify if called, and three of them stated they were never contacted by trial counsel. Carter contends that their testimony would have provided the jury with much more mitigating evidence to weigh against the aggravating factors and ultimately would have led to a lesser sentence.[5]

The Ohio Court of Appeals concluded that Carter had failed to establish either ineffective assistance of trial counsel or prejudice, finding that "the affidavits cited by Carter to support this claim contained information which was essentially cumulative to that already presented [in his statement] and did not present evidence sufficient to warrant an evidentiary hearing on this claim." *State v. Carter*, Nos. C-940375, C-940835, at *12 (Ohio Ct. App. Oct. 4, 1995).

---

[5]Ohio's death penalty statute requires that the finder of fact weigh mitigating factors against the aggravating factors (i.e., stipulations) proved beyond a reasonable doubt. These mitigating factors include the nature and circumstances of the offense; the history, character, and background of the offender; whether the victim induced or facilitated the killing; likelihood that the killing occurred as a result of duress, coercion, or strong provocation; and the offender's lack of criminal history and delinquency adjudications. Ohio Rev. Code Ann. § 2929.04(B).

Although it appears that counsel failed to contact three of Carter's family members, his younger brother, LaMarck; his older brother, George, Jr.; and his paternal aunt, Mary Coleman; their testimony would have offered little insight. They do not appear to have witnessed, nor been themselves, significant influences on Carter's life. Conversely, there are no allegations that counsel did not contact the four family members who appear to know more about Carter and his background than anyone else–his mother, his step-father, his sister, and his half-sister. Also, curiously absent from the record is any statement from trial counsel describing what he did or did not do in investigating Carter's background. By not detailing trial counsel's efforts to learn of Carter's background, Carter has provided no basis for a finding that trial counsel's investigation was unreasonable.

Even if trial counsel had rendered ineffective assistance, Carter was not prejudiced by it. The testimony Carter's family members were prepared to give–other than that which would have been cumulative to Carter's own statement–can hardly be described as mitigating. In fact, the affidavits describe a relatively stable, although imperfect, family environment. There are no allegations of physical or sexual abuse of Carter. While his father, George, Sr., was apparently an alcoholic and may have physically abused his mother, Brenda Walton, once or twice,[6] he left his family around the time Carter was three years old, and Carter has had almost no contact with him since. About the time George, Sr. left, Brenda Walton began dating William Walton, whom she later married. Brenda's children lived with her and William. They were a religious family, attending weekly church services and Bible study classes. William did his best to maintain discipline in the house, often through the use of corporal punishment. Eventually, William and Brenda moved the family from "the projects" in downtown Cincinnati to Mt. Healthy, Ohio, a more affluent suburb, in order "to get the kids into a better atmosphere" and escape an area that "had become infested with drug pushers."

Moreover, had the family members' testimony been admitted, the prosecutor would have been free to extract testimony of Carter's criminal history, his history of drug use and alcohol abuse, and his notoriously quick temper and violent character. There are multiple references in the affidavits to Carter's experience with the criminal justice system, including one incident where Carter turned himself in after beating someone with a baseball bat. Brenda Walton stated that she has seen Carter fight, but that "[h]e only jumped on people for a reason." She also recounted that at fourteen or fifteen, Carter began stealing for drug money. Marrell noted that Carter had been expelled from school "for breaking a white kid's jaw during a fight." She also stated that Carter "had a quick temper. . . . [His] temper would flare up even if he hadn't been drinking." Carter's brother LaMarck stated that he and Carter "fought with [their] fists and had reputations at [their] schools." He further remarked that Carter

> had a bad temper. . . . At fifteen he could still be reasoned with, but at twenty a confrontation usually ended in a fight. [Carter] would have to get a punch in and could not stop until he felt like it. As an adult, [Carter] would go off over something as simple as when I chastised our twin brothers.

Carter once beat a student and tried to "stuff his head down the sewer." George, Jr. said that Carter "would fight until he had demolished his opponent or was ready to quit." Several family members also mentioned Carter's penchant for alcohol and regular use of marijuana. In short, the testimony of Carter's family members likely would have reinforced that he was a temperamental, violent person despite his relatively stable background.

---

[6]The only reference to any alleged abuse is found in George, Jr.'s affidavit stating that it "may" have occurred.

The Supreme Court has found more limited investigations into a defendant's background justified where any evidence presented would have a "double edge." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (citing *Burger v. Kemp*, 483 U.S. 776 (1987); *Darden v. Wainwright*, 477 U.S. 168 (1986)). This Court has recently stated that counsel's "strategic decision to limit testimony about [defendant]'s past in order to prevent 'opening-the-door' to evidence of [defendant]'s criminal background" supported "the reasonableness of the Ohio Court of Appeals' determination regarding the performance of defense counsel." *Clark v. Mitchell*, 425 F.3d 270, 286 n.6 (6th Cir. 2005). Thus, this Court has concluded that it is "not even deficient performance, let alone prejudicial," for trial counsel to fail to introduce evidence of a defendant's background that "would likely [make] him look even worse to the jury." *Moore v. Parker*, 425 F.3d 250, 254 (6th Cir. 2005).

Given the lack of mitigating evidence available in this case and the likelihood that the testimony of Carter's family members would have done more harm than good, this was a sound decision. *Cf. Strickland*, 466 U.S. at 672-73 (finding to be reasonable trial strategy counsel's decision to present only Strickland's plea colloquy at sentencing in order to hide damaging evidence of Strickland's criminal history while at the same time emphasizing his remorse and acceptance of responsibility).

Carter's reliance on *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997), is misplaced. In that case, the court vacated Austin's sentence and remanded the case to the district court because of defense counsel's ineffective assistance during sentencing. *Id.* at 849. Austin's defense counsel "did not present *any* mitigating evidence because he did not think that it would do any good." *Id.* (emphasis added). The court ultimately found that counsel's "*failure to investigate* or present any mitigating evidence undermined the adversarial process and rendered the death sentence unreliable." *Id.* (emphasis added); *cf. Hamblin v. Mitchell*, 354 F.3d 482, 490 (6th Cir. 2003) (finding ineffective assistance where defense counsel stated in an affidavit that he did not obtain any information into the defendant's background nor did he contact any of the defendant's family members). Unlike the court in *Austin*, which had before it evidence of counsel's failure to investigate, we simply have no evidence that trial counsel did not investigate Carter's background. Without proof to the contrary, we must assume that counsel did investigate but ultimately decided that the best strategy at sentencing was not to present the testimony of Carter's family members. *See Strickland*, 466 U.S. at 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955))); *Monzo v. Edwards*, 281 F.3d 568, 582 n.6 (6th Cir. 2002) ("Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy."). In short, Carter simply failed to satisfy his burden.

Likewise, the three other cases Carter cites as comparable to his own are not. *See Wiggins*, 539 U.S. 510; *Hamblin*, 354 F.3d 482; *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003). As this court has already noted, those three cases "involve situations in which counsel failed *entirely* to seek or present mitigating family-background evidence." *Moore*, 425 F.3d at 255 (citing *Wiggins*, *Hamblin*, and *Frazier*). Since Carter has not provided evidence that trial counsel wholly failed to conduct an investigation into his family background, his reliance on *Wiggins*, *Hamblin*, and *Frazier* is misplaced

Therefore, we conclude that the Ohio Court of Appeals' denial of relief on this claim was neither contrary to nor an unreasonable application of clearly established federal law.

### D.  Failure to Present Certain Evidence at Trial

Carter claims that trial counsel rendered ineffective assistance by failing to present evidence that Carter's beating of the victim lasted only ten to thirteen minutes. The prosecution's theory, based on the testimony of several eye witnesses, was that the beating lasted approximately twenty

to twenty-five minutes. Carter's basis for claiming it was shorter is the testimony of inmate Richard Cunningham that the incident started at 1:15 p.m., combined with prison reports that security personnel responded to the situation between 1:25 and 1:30 p.m. It is Carter's position that trial counsel should have emphasized the shorter time span to show the attack occurred in a heat of passion rather than deliberately and premeditatedly.[7]

Although Cunningham did testify that the fight "probably started about quarter after 1:00," he also testified that he was forced to estimate the exact time because he had no clock or watch available to him. As a result, he based his estimate on the fact that he had to end a telephone call at 1:00 p.m. that afternoon and that he believed about fifteen minutes had passed between the end of his phone call and the start of the fight. At the very least, then, a defense theory based on Cunningham's statement of time would have been tenuous.

Moreover, Carter's habeas theory that the fight lasted only ten to fifteen minutes lacks any reasonable basis. First, as stated above, Cunningham had made clear that his statement of time was a mere estimate. In other words, he had no way of knowing the exact time the fight started. Furthermore, Cunningham testified on cross that he did not even witness the start of the fight. Since Cunningham lacked personal knowledge, his testimony as to when the fight started is irrelevant. Finally, Cunningham himself testified that the beating lasted much longer than fifteen minutes:

Q. How long did [the beating] go on?

A. For about 25 minutes.

Q. You have no watch or anything that you can tell time or anything or a clock on the wall or anything?

A. No. You know, I estimate 25 minutes, he probably started about quarter after 1:00, I knew it was 1:00 o'clock I had to get off the phone, that is my time to get off the phone. It took about 15 minutes before I got my cigarette lit. The guards got up there about quarter to 2:00. It took about half hour to 45 minutes before they even got up there.

In short, then, there is no credible factual basis from which Carter can argue that reasonable counsel would have pursued the theory that the altercation lasted no more than fifteen minutes.

---

[7]He also claims that the prosecutor improperly withheld evidence that the beating lasted only ten to thirteen minutes. The Supreme Court in *Brady v. Maryland* held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Constitutional error results "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)).

Carter's *Brady* claim is wholly without merit. The information regarding the timing of the altercation was fully extracted from witnesses at trial, and Carter had an opportunity to question them about it. Carter concedes that trial counsel had copies of three reports detailing the time of the security response. *See United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990) (stating that there is no *Brady* violation where the defendant "was aware of the essential facts that would enable him to take advantage of the exculpatory evidence"); *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990) (stating that "'the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources'" (quoting *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986))). The two reports apparently not handed over to trial counsel were merely cumulative to the information in the other reports and thus not material for purposes of *Brady* analysis. *See Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)). Therefore, the state court did not err in denying Carter relief on this claim.

Most importantly, trial counsel's strategy with Cunningham on cross examination focused not on Cunningham's estimation of when the fight started but whether he saw the start of the fight at all. Cunningham testified on direct examination that the altercation began when Carter "sucker punched" Allen while Allen was asleep. On cross, trial counsel questioned Cunningham as to his whereabouts when the fight began, and Cunningham admitted that he did not see what started the altercation. Cunningham's testimony on cross-examination preserved trial counsel's primary defense theory that Allen, not Carter, was the aggressor. If believed, Carter could have avoided a jury finding that he killed Allen with prior calculation and design. At the very least, he could have used it as a mitigating factor at sentencing. Trial counsel's strategy to paint Allen as the aggressor was reasonable, and to question Cunningham in a manner consistent with this theory, counsel was not ineffective.

Carter also was not prejudiced. Both Cunningham and inmate Steele testified that the beating lasted approximately twenty-five minutes. There is no credible evidence to dispute their estimates. Equally important is that there is no reason to believe that proof that the beating lasted ten minutes instead of twenty or twenty-five minutes would have had any effect on the outcome. The emphasis at trial was not on the duration of the beating, but on the calculated and violent manner in which it was carried out. This included Carter's comments and actions before and during the altercation, along with his efforts to create exculpatory evidence. Furthermore, in this case, even a ten-minute altercation would have been significant. The altercation at issue was nothing more than an attack. That Carter's continuous beating of Johnny Allen may have lasted "only" ten minutes would hardly be seen as mitigating. Quite simply, there is no merit to Carter's claim that he was prejudiced by trial counsel's failure to emphasize that the attack may have lasted only ten minutes.

Therefore, the decision of Ohio Court of Appeals denying Carter's ineffective-assistance claim was neither contrary to nor an unreasonable application of clearly established federal law.

## IV. Other Issues

### A. Presentation of False Testimony

Carter also alleges that the prosecutor improperly presented false testimony at trial. Specifically, he claims that the prosecution's failure to correct the false testimony of one of its witnesses, inmate Calvin Steele, violated Carter's due process rights. The testimony at issue involved Steele's answers to trial counsel's questions on cross-examination. During one exchange, Steele denied having an agreement with the prosecution in exchange for his testimony, even though he had already acknowledged having such an agreement on direct examination.

The Ohio Court of Appeals noted

that in order for the prosecution's use of allegedly false testimony to state a constitutional claim, that use must have been knowing, *i.e.*, the prosecution must have been aware that it was suborning perjury. Carter makes no attempt to establish that the state knew of any perjured testimony. Moreover, the affidavits offered in support of this claim did not support the arguments that Carter was convicted with false testimony or that key impeachment evidence was withheld.

*State v. Carter*, Nos. C-940375, C-940835, at *18 (Ohio Ct. App. Oct. 4, 1995) (citations omitted). Accordingly, the court denied Carter relief on this claim. *Id.*

The district court held an evidentiary hearing on the issue, during which the prosecutor agreed that Steele's testimony on cross-examination was inconsistent with the responses he had given on direct examination. The court ultimately found the claim meritless, however, because Carter had not shown that the prosecutor knowingly presented false testimony. The district court

held an evidentiary hearing on the issue, and, thus, we review the factual findings for clear error while reviewing the ultimate conclusion de novo. *Hill v. Hofbauer*, 337 F.3d 706, 710 (6th Cir. 2003).

It was well-established at the time of Carter's trial that a defendant's right to a fair trial may be violated where the prosecution deliberately misleads a jury or allows misleading testimony to go uncorrected with respect to any promise offered to a key prosecution witness in exchange for his testimony. *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271)).

On direct examination, Steele clearly indicated that he had agreed to testify in exchange for the prosecution's consideration in his own criminal case.[8] However, on cross-examination, Steele

---

[8]

Q. And on January 30, 1989, you entered into a plea to an offense known as attempted aggravated burglary, which you were charged with, without a specification that required a prior conviction, that was attached to that charge; is that correct, sir?

A. Yes, sir.

Q. And in addition to that, a charge of possessing criminal tools was dropped against you by the state; is that correct, sir?

A. Yes, sir.

Q. And in the course of that, Judge Sundermann ordered your sentencing continued pending the preparation of the presentence investigation?

A. Yes, sir, that's correct.

Q. And also indicated that he would delay said sentencing until such time as you had appeared in this court and testified; is that correct?

A. Yes, sir.

Q. And this is your understanding?

A. Yes, sir.

denied that he was ever offered any deal by the prosecution in exchange for his testimony.[9] The prosecutor made no attempt to correct these misstatements.

Both the state court and the district court concluded that no constitutional violation occurred based on the fact that Carter had not proven that the prosecutor knowingly *presented* false testimony. However, neither court addressed the *Giglio* issue specifically, that is, whether the prosecutor deliberately *allowed* misleading testimony to go uncorrected with respect to any promise offered to a key prosecution witness in exchange for his testimony.

Nonetheless, the state court's decision was not "contrary to" clearly established federal law, because the facts of *Napue* and *Giglio* are distinguishable from the facts of this case. In *Napue*, the state's sole eyewitness falsely testified that he was receiving no consideration from the state in return for his testimony, even though the prosecutor had promised to help him if the witness's story "'about being a reluctant participant' in the robbery was borne out." *Napue*, 360 U.S. at 267. In *Giglio*, the prosecutor not only allowed false testimony of its key witness to go uncorrected, he affirmatively stated in summation that the witness "'received no promises that he would not be indicted.'" *Giglio*, 405 U.S. at 152. And like *Napue*, the prosecution's case in *Giglio* "depended almost entirely on [that witness]'s testimony." *Id.* at 154. The Court in both cases held that the prosecution's conduct violated the defendants' constitutional rights. *See id.* at 153-54; *Napue*, 360 U.S. at 269.

---

[9]

Q. Well, nobody ever offered you any consideration to make this statement, right?

A. That's right, sir.

. . . .

Q. How did this deal come to pass?

A. What deal?

Q. The one where your specifications were dropped and your sentencing could be continued until after this testimony?

A. I mean the specifications, they do that normally every day in courts.

Q. So you didn't enter into an agreement with [the prosecutor] in order for you to testify?

A. No, I did not.

Q. And you didn't ask that your sentencing be put over until after you testified so that the judge could give consideration to this?

A. Well, me and the judge discussed it because of the pending testimony and he didn't say anything about reducing the sentence or anything of that nature.

Q. Now, I know the prosecutor can't say to you specifically, we are going to do this deal for you. But did he tell you that if you came in and you testified that he would consider it and help you out down the road?

A. No, he didn't.

Q. He never did that for you?

A. (Shaking head in the negative).

Unlike the witness in *Napue*, Steele had an agreement with the state in exchange for his testimony generally, not in exchange for a particular version of the facts. And unlike *Giglio*, the prosecutor here did not tell the jury that he had no agreement with Steele. In fact, the prosecutor here told the jury in his opening statement that there was such an agreement, and elicited an admission to that effect during his direct examination of Steele. Perhaps most importantly, unlike either of those cases, Steele was not the lynchpin of the state's case against Carter. Steele was one of four inmate-eyewitnesses the prosecution called. All four testified to the events during the altercation, and two of them–neither of whom was Calvin Steele–testified to events prior to the beating that evidenced Carter's prior calculation and design. Thus, *Napue* and *Giglio* are clearly distinguishable from the facts of this case. Accordingly, we cannot say that the decision of the Ohio Court of Appeals was "contrary to" clearly established federal law.

Nor was the state court's decision an "unreasonable application of" clearly established federal law, because *Napue* and *Giglio* require a new trial only where "'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271)). Here, there is no reasonable likelihood that the false testimony affected the jury's decision. Again, Steele's testimony was not, as Carter contends, the "keystone" of the prosecution's case. The jury had the testimony of three other eyewitnesses from which to conclude that Carter killed Allen with prior calculation and design. In fact, Carter does not even argue his innocence. Instead he argues that the jury would not have recommended a death sentence if it had not heard Steele's tainted testimony that Carter first struck Allen. As the Ohio Supreme Court noted, however, Joseph Carroll had testified that "[a]s Allen walked past Carter to get a broom, Carter 'jumped on him, punched him, [and] knocked him down.' As Allen lay on the floor, Carter 'leaned over him, punched him, kicked him and choked him.'" *State v. Carter*, 594 N.E.2d 595, 596 (Ohio 1992) (second alteration in original). This, combined with the evidence of Carter's preparation for an attack, gave the jury enough evidence to find that Carter had been the aggressor. Therefore, the state court's decision was not an "unreasonable application" of clearly established federal law,

Moreover, for these same reasons, any constitutional error would have been harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Mitzel v. Tate*, 267 F.3d 524, 534 (6th Cir. 2001) (stating that *Brecht* harmless-error review applies under the AEDPA, "even when the 'federal habeas court is the first to review for harmless error'" (quoting *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999))).

## B. Newly Discovered Evidence/Insufficient Evidence to Support Conviction

Finally, Carter claims that he should receive a new trial because newly discovered evidence reveals that insufficient evidence exists to support his aggravated murder conviction. Carter bases this claim on the affidavits of two witnesses who testified for the prosecution at trial and on the affidavit of another inmate, Chris Isome, who did not testify at the trial. The witnesses' affidavits recant their trial testimony, claiming they lied because of the deals the prosecution promised them. Isome's affidavit states that Allen threatened revenge against Carter after their confrontation over the television.

The Ohio Court of Appeals concluded that this claim was procedurally defaulted. *Carter*, Nos. C-940375, C-940835, at *10-11. The court also denied Carter's claims on the merits, concluding "that the purported 'newly discovered evidence' was merely cumulative of evidence presented previously and that it did not undermine the jury's conclusion that Carter killed Allen with prior calculation and design." *Id.* at *11. The district court found the claim procedurally defaulted and held an evidentiary hearing on the matter to determine whether Carter had established actual innocence to excuse the procedural default. Following the evidentiary hearing, the district court found no reason to excuse the default and ultimately denied the claim.

Generally, federal courts may not consider habeas claims not considered by the state courts due to procedural default. *Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000). This Circuit applies the familiar test of *Maupin v. Smith* to determine whether a claim is procedurally defaulted: (1) whether there is a procedural rule that the petitioner failed to follow; (2) whether the state courts actually enforced the rule; (3) whether the procedural default is an "adequate and independent" ground on which the state can rely to foreclose review of a federal constitutional claim; and (4) whether the petitioner has shown "cause" for his failure to follow the rule and "prejudice" resulting therefrom. 785 F.2d 135, 138 (6th Cir. 1985). Even where a petitioner fails to show cause and prejudice, the court must still consider whether a miscarriage of justice would occur if the procedural default were enforced. "Specifically, a court may notice an otherwise defaulted claim if it concludes that petitioner has shown by clear and convincing evidence that but for constitutional error no reasonable juror would have found him guilty of the crime . . . ." *Greer v. Mitchell*, 264 F.3d 663, 673 (6th Cir. 2001).

Citing its decision in *State v. Zuern*, the Ohio Court of Appeals held that Carter's claim was barred under res judicata because it could and should have been raised in a motion for a new trial under Ohio Rule of Criminal Procedure 33(B), and not in a successive petition for post-conviction relief. *Carter*, Nos. C-940375, C-940835, at *15-16. Although the state court also denied Carter relief on the merits, "[w]hen the state court relies on an independent procedural ground in order to deny relief, its discussion of the merits of the claim will not disturb the procedural bar." *Clifford v. Chandler*, 333 F.3d. 724, 728 (6th Cir. 2003), *overruled in part on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003). Thus, the first two *Maupin* factors are met.

This court has consistently held that Ohio's doctrine of res judicata is an "adequate and independent" ground justifying default. *See, e.g.*, *Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004) (finding meritless petitioner's claim that the Ohio courts do not consistently apply the doctrine of res judicata in capital cases), *cert. denied*, 125 S. Ct. 1939 (2005); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (finding that "Ohio's doctrine of res judicata as a procedural bar is regularly applied by the Ohio courts"); *Greer*, 264 F.3d at 673 (noting that "this court has rejected contentions that Ohio has failed to apply its [doctrine of res judicata] consistently"). Carter does not argue otherwise. Thus, we conclude that Ohio's doctrine of res judicata is an adequate and independent ground on which to foreclose Carter's claim.

Lastly, Carter does not argue "cause" to excuse the procedural default, and no cause is apparent from the record. Having determined that no cause exists, we need not decide whether Carter suffered any prejudice. *See Lott v. Coyle*, 261 F.3d 594, 609 (6th Cir. 2001).

The final inquiry is whether a miscarriage of justice would result through enforcement of the procedural default. A miscarriage of justice exists in the extraordinary case where the petitioner demonstrates his actual innocence. *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Williams*, 380 F.3d at 973. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Carter cannot establish his actual innocence because he admitted killing Allen at sentencing.[10] Instead, he argues that this evidence creates reasonable doubt as to whether he killed

---

[10]

Q.     [Carter], do you have remorse, or do you feel sorry for what happened, for what you did to Johnny Allen?

A.     Yes, I feel sorry. I have been feeling sorry for it, you know. I told people how sorry I am for it, and especially for his mother, you know. I feel a lot for his mother, you know, because I know that, you know, she had him, and that was her child, and I did take his life. But I feel sorry for it. I am sorry for it.

Allen with prior calculation and design. However, none of the "newly discovered evidence" casts any doubt on Carter's conviction or sentence. Isome's affidavit merely provides evidence of Allen's state of mind prior to the altercation; it says nothing about Carter's state of mind or whether Carter acted with prior calculation and design. The affidavits of Steele and Johnson, both still inmates in the Ohio correctional system, are of little value, as they merely recant their trial testimony. *See Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984) (Brennan, J., dissenting from denial of certiorari) ("Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction."); *Byrd v. Collins*, 209 F.3d 486, 508 n.16 (6th Cir. 2000) ("'Recanting affidavits and witnesses are viewed with extreme suspicion by the courts.'" (quoting *Spence v. Johnson*, 80 F.3d 989, 997 (5th Cir. 1996))). Moreover, Steele has since recanted his affidavit and pled guilty to a charge of perjury. During his plea colloquy, Steele acknowledged that the testimony he gave at Carter's trial was true and that his subsequent affidavit was false.[11] In short, Carter's evidence does not establish his actual innocence or any doubt as to his sentence. Therefore, we conclude that this claim is procedurally defaulted.

## V.

For the foregoing reasons, the judgment of district court is **AFFIRMED**.

---

[11]Carter argues that the district court erred by not compelling Steele and Johnson to testify at the evidentiary hearing after they had invoked their Fifth Amendment rights. "A defendant's right to compel a witness to testify must yield to that witness's assertion of his or her Fifth Amendment privilege against self-incrimination when that assertion is grounded upon a reasonable fear of prosecution." *United States v. Mack*, 159 F.3d 208, 217 (6th Cir. 1998). The district court has broad discretion in determining whether the invocation of the Fifth Amendment privilege is meritorious. *Id.*

Johnson had a reasonable basis to fear prosecution for perjury based on Steele's perjury conviction. Steele, in turn, had a reasonable fear of prosecution based on his own perjury conviction in state court. Steele did not lose his reasonable fear of prosecution based on his state-court conviction, *see United States v. Smith*, 245 F.3d 538, 543 (6th Cir. 2001), because double jeopardy would not have protected him in federal court, *see United States v. Louisville Edible Oil Prods., Inc.*, 926 F.2d 584, 587 (6th Cir. 1991) ("[T]he double jeopardy clause of the fifth amendment bars only additional prosecution by the same sovereign."). Had Steele refuted his affidavit in federal court, he would have been subjected to federal perjury charges based on his false affidavit. Had he recanted his plea-hearing testimony and testified to the truthfulness of his affidavit, he would have been subjected to state perjury charges based on his false plea-hearing testimony. Therefore, the district court did not err in refusing to compel Johnson's and Steele's testimony.